**John R. DOOLITTLE, as a person participating in the affairs of Bay Gulf Federal Credit Union, Petitioner,**

v.

**NATIONAL CREDIT UNION ADMINISTRATION, Respondent.**

**No. 91–4075.**

United States Court of Appeals, Eleventh Circuit.

June 14, 1993.

Steven R. Bisker, Annandale, V.A, for petitioner.

Barbara C. Biddle and Christine N. Kohl, Appt. Staff/Civ. Div., Dept. of Justice, Washington, DC, for respondent.

Before KRAVITCH and ANDERSON, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

John R. Doolittle appeals an order of the National Credit Union Administration that prohibits him from participating in any manner in the affairs of any federally-insured institution and directs him to pay the sum of $42,857 to Bay Gulf Credit Union as restitution. We vacate and remand the decision of the National Credit Union Administration.

## I. Background

John R. Doolittle ("Doolittle") worked for Bay Gulf Credit Union ("Bay Gulf") for eighteen years, the last eight of which he served as president and was a member of the Board of Directors. Bay Gulf is a federally insured credit union, and as such it falls under the auspices of the National Credit Union Administration ("NCUA") pursuant to the Federal Credit Union Act ("FCU Act"), 12 U.S.C. § 1751, *et seq.* On April 19, 1990, Doolittle's employment with Bay Gulf was terminated by vote of the Board of Directors. Doolittle subsequently brought suit against Bay Gulf for breach of contract and against David Becker, a consultant for the NCUA who succeeded Doolittle as president, for tortious interference with a business and contractual relationship.

On February 12, 1991, the NCUA filed a Notice of Intent to Prohibit and Impose Other Remedial Sanctions ("Notice of Intent") against Doolittle. The Notice of Intent set forth five counts against Doolittle that charged him with violating the provisions of the FCU Act and accompanying regulations by engaging in unsafe and unsound practices, thus imperiling Bay Gulf and demonstrating Doolittle's unfitness to participate in the af-

fairs of a federally insured credit union. The Notice of Intent did not allege and the record does not indicate that Doolittle derived any personal gain from the conduct set forth in the charges.

A formal administrative hearing was held before an Administrative Law Judge ("ALJ") who issued a Recommended Decision proposing that Doolittle be prohibited from future participation in the conduct of the affairs of any federally insured credit union and that he also be ordered to make restitution to Bay Gulf in the amount of $42,857. The NCUA Board adopted the ALJ's decision and recommended findings and conclusions in its October 15, 1991, Final Decision and Order after finding Doolittle's exceptions to the ALJ's decision non-meritorious. Doolittle then filed the appeal now before us.

The Notice of Intent alleged five counts of wrongdoing by Doolittle. Count I involved certain real estate, Priority One Learning Center ("Priority One"), owned by Bay Gulf. Priority One was valued on the books at $459,243 as a commercial property because a day care center had been operated there. This amount equaled the balance due on the outstanding loan on Priority One and was $30,000 less than a July 1989 appraisal. Desiring to know more about the property and the operation of a day care center in order to sell Priority One, Doolittle had a local real estate firm do an analysis of the property. The firm valued the property at $264,000 as residential property. Priority One was a commercial property in a residential area, but its zoning reverted to residential use while Bay Gulf owned it. The commercial zoning status could be renewed. Despite the apparent drop in the value of Priority One, Doolittle neither changed the valuation on the books nor adjusted the loan loss reserves to reflect a probable loss on the outstanding loan due to the reduced value of the property. Doolittle contended that he did not act on this market analysis because it failed to include the information he wanted about how to operate a day care center. The ALJ found that, in light of the change of the zoning, Doolittle should have obtained another appraisal after finding this one unsatisfactory, and, at a minimum, should have informed the Board of Directors. Before dis-

tributing any dividend, Bay Gulf was required to adjust its loan loss reserves to reflect any anticipated losses. Because Bay Gulf had only $50,000 in undivided earnings for the first quarter of 1990, even a $50,000 transfer to the loan loss reserves would have wiped out the undivided earnings, and Bay Gulf would have been unable to pay a quarterly dividend without prior NCUA approval.

Counts II, III, and IV of the charges against Doolittle arise from certain accounting irregularities in Bay Gulf's books. The NCUA concluded that Doolittle breached his duty to insure that all transactions were recorded in an accurate and timely manner and reflected the results of the operation of Bay Gulf, and that such failures violated regulations requiring full and fair disclosure.

Specifically, Count II alleges improper accounting for legal expenses, data processing expenses, and employee sick time. The ALJ found that over $10,000 in legal expenses were invoiced in March, but recorded as an expense in April. The insurance reimbursement check for the legal expenses was received in April, but pursuant to Doolittle's specific directions, the reimbursement was recorded as income for March after the end of that month. Bay Gulf received a commitment from the insurer in March that it would pay $10,000. This recording method did not comply with either accrual or modified cash basis accounting, which are the two authorized accounting methods for credit unions.

Bay Gulf had a recurring monthly data processing expense of which Doolittle was aware. The ALJ found that the General Ledger indicated that a special entry was made so that the expense would appear in April rather than March. The amount of this deferred expense ($22,000) was material because of the negligible net income for the first quarter ($2,500). Doolittle testified without contradiction that the data processing expenses were recorded in the same manner from 1986 through March 1990 pursuant to an agreement between Bay Gulf and the data processing agent, and that there were always twelve bills recorded in each fiscal year.

The final violation alleged in Count II was that vested employee vacation, sick, and compensatory time was not recorded as a liability in the records of the Credit Union. Thus, the financial records failed to disclose an almost $100,000 liability. Doolittle testified without contradiction that employee leave time was recorded as an expense when taken rather than when it vested, and this practice had been consistently followed for several years.

Count III of the Notice of Intent charged Doolittle with improperly altering asset depreciation schedules to inflate income for the first quarter of 1990. Doolittle changed the depreciation lives of certain fixed assets in March, but he contended that these changes were made in response to a NCUA directive to reduce expenses. Doolittle checked with two board members who were IRS employees, and the changes complied with IRS guidelines. Doolittle admitted that the reason for the changes was to increase income for the quarter. The net effect of these changes for March alone was enough to determine whether the Credit Union showed a net profit or net loss for the first quarter of 1990. The ALJ found that where there is a change in an accounting estimate, there should have been some justification (like new evidence) and disclosure of the impact on the profitability of the institution.

Count IV concerns alleged improprieties in recording Non–Sufficient Funds ("NSF") income and Automatic Teller Machine ("ATM") income. Rather than being recorded as income, NSF and ATM fees were recorded as credits to the expense accounts. The effect of this accounting procedure was to decrease gross income which reduced the requisite transfer to statutory reserves, which, in turn, left more money available for the undivided earnings dividend pool. Doolittle testified without opposition that these fees were recorded in this manner since 1987 or 1988 without NCUA objection, and also contended that the accounting procedure had only a negligible impact on Bay Gulf's income and reserve transfers.

Count V involved certain unauthorized loans that Bay Gulf extended to one of its members, James Mims ("Mims"). In April 1989 Doolittle became aware that Bay Gulf had made commercial loans to Mims in violation of NCUA and Bay Gulf rules and regulations against commercial loans. Doolittle called a meeting between Mims and Bay Gulf personnel at which he informed Mims that no more loans would be made. Doolittle told the loan department supervisor who had handled Mims' file not to make any more loans to Mims and to mark the file accordingly. The loans were current at that time, and Doolittle did not inform the Board of Directors or the NCUA of the unauthorized commercial loans until they later went into default. Despite Doolittle's instructions to the contrary, Bay Gulf made four more loans to Mims before he defaulted and eventually suffered a $42,857 loss. The ALJ concluded that Doolittle's failure to supervise his loan employees effectively and to inform the Board of Directors constituted a breach of his fiduciary duty and an unsafe and unsound practice. The ALJ further found that by failing to take effective measures and inform the board, Doolittle demonstrated reckless disregard of the prohibition against commercial loans.

## II. Discussion

### A. *Standard of Review*

■ We review the NCUA Board's decision on a narrow standard. Thus, we cannot reverse the NCUA Board's action unless the findings upon which it is based are not supported by substantial evidence, or unless the sanctions imposed by the Board constitute an abuse of discretion or are otherwise arbitrary and capricious. 5 U.S.C. § 706(2)(A), (E); *Sunshine State Bank v. Federal Deposit Ins. Corp.*, 783 F.2d 1580, 1584 (11th Cir.1986).

### B. *Prohibition Sanction*

■ Section 1786(g)(1) [1] of the FCU Act gives the NCUA authority to issue a prohibi-

1. This section states:
 (g) **Removal and prohibition authority**
 (1) **Authority to issue order.** Whenever the Board determines that—

(A) any institution-affiliated party has, directly or indirectly—
(i) violated—
(I) any law or regulation;

tion order when it determines that a party has directly or indirectly violated any law or regulation, participated in an unsafe or unsound practice, or breached a fiduciary duty, and, by reason of such conduct, the financial interest of the credit union is imperiled. The NCUA Board must also conclude that the person has engaged in practice constituting personal dishonesty or is otherwise unfit to participate in the conduct of the affairs of a federally insured credit union.

In the instant case, the NCUA Board based its prohibition order primarily on Doolittle's alleged violations of laws or regulations, except for the breach of fiduciary duty found in relation the Mims loans. Specifically, the NCUA Board ruled, by adopting the ALJ's findings, that Doolittle violated 12 C.F.R. § 702.3(c)(2) by not making a proper allowance for loan losses with regard to the Priority One property involved in Count I. With regard to the accounting irregularities alleged in Counts II, III, and IV, the NCUA Board found that Doolittle violated both 12 C.F.R. § 702.3(b)(1) which requires full and fair disclosure of "all income and expenses necessary to present fairly the results of operations for the period concerned" and § 702.3(d) which requires the president to declare that the financial statements are true and correct to the best of his knowledge and present "fairly the financial position and the results of operations for the period covered." With regard to the Mims loans, the NCUA Board found that Doolittle breached his fiduciary duty and engaged in an unsafe and unsound practice, thereby satisfying 12 U.S.C. § 1786(g)(1)(A)(ii) and (iii).

■ Some of the accounting irregularities found by the NCUA Board support the conclusion that Doolittle violated NCUA regulations requiring adjustments to loan loss reserves and full and fair disclosure of the credit union's financial condition. In particular, the evidence suggests that Doolittle did have notice that the value of Priority One had fallen because of the change in zoning but failed to act on this knowledge. Also, Doolittle specifically directed that the insurance reimbursement check for legal services that was received in April be reported as income for March. The bill for the legal services was received in March, but was not listed as an expense until April. Doolittle's conduct in these matters implies intentional misrepresentation of the financial condition of Bay Gulf. To a lesser extent, the change in asset depreciation schedules involved in Count III also demonstrates misrepresentation because even though the alterations were justified under IRS guidelines, Doolittle instituted these changes without justification, other than to increase income, and failed to disclose the impact on profitability to the Board of Directors or the NCUA.

■ At first glance, these accounting practices seem relatively insignificant, but Doolittle's conduct gains significance when viewed in light of the circumstances. March 1990 was the end of the first quarter of Bay Gulf's fiscal year. Dividends were payable on a quarterly basis, and, even with these ac-

---

(II) any cease-and-desist order which has become final;
(III) any condition imposed in writing by the Board in connection with the grant of any application or other request by such credit union; or
(IV) any written agreement between such credit union and the Board;
(ii) engaged or participated in any unsafe or unsound practice in connection with any insured credit union or business institution; or
(iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;
(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—
(i) such insured credit union or business institution has suffered or will probably suffer financial loss or other damage;

(ii) the interests of the insured credit union's members have been or could be prejudiced; or
(iii) such party has received financial gain or other benefit by reason of such violation, practice or breach; and
(C) such violation, practice, or breach—
(i) involves personal dishonesty on the part of such party; or
(ii) demonstrates such party's unfitness to serve as a director or officer of, or to otherwise participate in the conduct of the affairs of, an insured credit union,
the Board may serve upon such party a written notice of the Board's intention to remove such party from office or to prohibit any further participation, by such party, in any manner in the conduct of the affairs of any insured credit union.
12 U.S.C.A. § 1786(g)(1) (West 1989).

counting irregularities, Bay Gulf was only marginally profitable for the first quarter. The record indicates that if Bay Gulf had shown a loss for the first quarter, it would have had to obtain special permission from the NCUA prior to declaring its quarterly dividend. Furthermore, the NCUA had recently downgraded the competency rating of Bay Gulf's management due to its inability to improve the financial condition of the credit union. Given these circumstances, Doolittle was probably under some pressure to show a profit for the first quarter of 1990 so that Bay Gulf could declare a dividend. The NCUA Board found that each of the accounting violations it alleged was sufficient to change the outcome of the first quarter from loss to profit. Therefore, Doolittle's misrepresentations of Bay Gulf's financial condition for the first quarter of 1990 support the NCUA Board's determination that Doolittle violated regulations requiring full and fair disclosure of Bay Gulf's financial condition.

The remaining accounting irregularities found by the NCUA Board do not give rise to the inference that Doolittle violated full and fair disclosure regulations. Specifically, the improper accounting practices alleged in Count II, that data processing expenses were reported the month after the bill was received and that employee leave time was recorded as an expense when taken rather than when it vested, and in Count IV, netting NSF and ATM fee income against expenses, were, according to Doolittle's uncontroverted testimony, employed by Bay Gulf for several years. Doolittle testified without opposition that these items were recorded in the same manner since at least 1988 and the NCUA regularly inspected Bay Gulf's books without objection. Also, the data processing expenses recurred monthly, and Doolittle testified without contradiction that twelve such expenses were reported monthly in each fiscal year. Given the consistency of these accounting practices, the record does not contain substantial evidence to support the conclusion that Doolittle violated full and fair disclosure regulations by manipulating the accounting of these items to inflate Bay Gulf's income for the first quarter of 1990.

Similarly, the NCUA Board's determination that Doolittle's handling of the Mims loans was an unsafe and unsound practice and a breach of his fiduciary duty is not supported by substantial evidence. After Doolittle became aware of the problem loans, he took steps that he judged to be sufficient to prevent further escalation of the situation. Hindsight reveals that he did not do enough, but he cannot be held to have breached his fiduciary duty simply because his underlings failed to follow his orders. The loans were current at the time Doolittle took the actions for which he is now prosecuted. When the loans defaulted, he informed the Board of Directors and took action to reduce Bay Gulf's losses.

This is not a case where a fiduciary engaged in imprudent lending activities or stood idle and allowed damage to increase. Instead, Doolittle took what he mistakenly believed to be appropriate corrective actions. Doolittle's behavior does not resemble that which is traditionally considered to be a breach of fiduciary duty. See, e.g., *Hoye v. Meek*, 795 F.2d 893 (10th Cir.1986) (Bank director delegated too much authority to agent, failed to monitor agent, and failed to respond to bank's increasing exposure to risk); *Federal Deposit Ins. Corp. v. Butcher*, 660 F.Supp. 1274 (E.D.Tenn.1987) (Director's failure to provide time and attention required by the corporation, surrender of control and power to officers, committing large, unsecured loans to insolvent entities and to companies affiliated with corporation and its president, and failure to carefully examine financial reports); *Federal Deposit Ins. Corp. v. Wise*, 758 F.Supp. 1414 (D.Colo. 1991) (Directors caused bank to extend large, imprudent loans to favored parties contrary to bank policies and federal regulations, commit excessive assets high risk loans despite repeated warnings from state and federal regulators, acquire loans without full and adequate investigation, and enter transactions with affiliated parties contrary to lending and underwriting policies). Doolittle's response to the Mims loans does not reflect a breach of the sacred trust owed by a fiduciary, and therefore we cannot agree that Doolittle breached his fiduciary duty.

■ Neither can we agree that Doolittle engaged in an unsafe or unsound practice with regard to the Mims loans. "Unsafe and unsound banking practices are defined as 'conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder.'" *Northwest Nat'l Bank, Fayetteville, Ark. v. Department of the Treasury*, 917 F.2d 1111, 1115 (8th Cir.1990), *quoting First Nat'l Bank v. Department of the Treasury*, 568 F.2d 610, 611 (8th Cir.1978). Taking corrective actions to minimize the risk of loss on improvident loans is not conduct contrary to accepted standards of banking operations which might result in an abnormal risk to a banking institution. Thus, Doolittle did not engage in unsafe and unsound banking practices.

■ The prohibition sanction adopted by the NCUA Board is harsh. Doolittle is precluded from working in his chosen profession for the remainder of his career. We must assume that the NCUA Board considered all of the accounting violations in fashioning this draconian sanction. We hold that some of the violations relied upon by the NCUA, as described above, do not show that Doolittle breached the full and fair disclosure regulations in 12 C.F.R. § 702.3, and also that Doolittle's conduct with regard to the Mims loans did not breach his fiduciary duty or amount to unsafe or unsound practices. We cannot assume that the NCUA Board would issue the same severe sanction without all of the violations upon which it previously relied. Therefore, we vacate the prohibition order and remand this case to the NCUA Board for reconsideration in light of only those accounting practices which we find to be indicative of Doolittle's violating his obligation to full and fair disclosure of Bay Gulf's financial condition.

■ We must also explore the meaning of 12 U.S.C. § 1786(g)(1)(C), which provides that when the NCUA Board determines that a party has engaged in a violation, practice, or breach that satisfies subparagraph (A) (violation of law or regulation, unsafe or unsound practice, or breach of fiduciary duty) and subparagraph (B) (jeopardizes financial interests of credit union and members or

inures to personal benefit of party), the Board may order prohibition if it also finds that such violation, practice, or breach involves personal dishonesty (1786(g)(1)(C)(i)) or "demonstrates such party's unfitness to serve as a director or officer of, or to otherwise participate in the conduct of the affairs of, an insured credit union." (1786(g)(1)(C)(ii)). Because there is no indication of personal dishonesty, the NCUA Board based the prohibition order on unfitness to serve. The NCUA Board did not specify how Doolittle's conduct demonstrated his unfitness to serve as an officer and director, but, instead, the Board merely adopted the ALJ's cursory conclusion that all of the statutory requirements for a prohibition order had been met. We conclude that this omission cannot stand.

When divining the meaning of a statute, we must bear in mind "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative...." *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985). Applying this maxim to subsection 1786(g)(1)(C)(ii) leads to the conclusion that the NCUA Board must make some finding as to a party's fitness to participate in the conduct of the affairs of a credit union. This finding must be more than a violation, practice, or breach sufficient to satisfy subparagraph (A) because otherwise subsection 1786(g)(1)(C)(ii) would be surplusage. Thus, the NCUA must do more than find a subparagraph (A) violation, practice, or breach and recite such as the basis for concluding that subparagraph (C) is satisfied.

■ Subparagraph (C) provides that a prohibition order may be based either on a finding of personal dishonesty or on a finding of unfitness to serve. We interpret this juxtaposition to mean that the NCUA Board's determination of unfitness must be supported by a finding of equal gravity to a finding of personal dishonesty. This conclusion is supported by cases interpreting the analogous removal and prohibition section of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1818(e)(1). Subparagraphs 1818(e)(1)(A) and (B) contain nearly identical

language to 12 U.S.C. §§ 1786(g)(1)(A) and (B). Subparagraph 1818(e)(1)(C) of the FDI Act provides that a prohibition order may issue when the agency determines that a party has engaged in a violation, practice, or breach which:

(i) involves personal dishonesty on the part of such party; or

(ii) demonstrates willful or continuing disregard by such party for the safety or soundness or such insured depository institution or business institution

12 U.S.C.A. § 1818(e)(1)(C) (West 1989). Conduct sufficient to satisfy subsection 1818(e)(1)(C)(ii) must have the same magnitude as personal dishonesty. See, e.g., *Jameson v. Federal Deposit Ins. Corp.*, 931 F.2d 290 (5th Cir.1991) (falsification of bank records to conceal bonus from other bank officials); *Van Dyke v. Board of Gov. of the Fed. Reserve Sys.*, 876 F.2d 1377 (8th Cir. 1989) (bank officer participated in check-kiting scheme); *Brickner v. Federal Deposit Ins. Corp.*, 747 F.2d 1198 (8th Cir.1984) (continuing disregard evinced where bank officers knew cashier was engaging in unsafe and unsound banking practices for months, but failed to take suitable preventative action before substantial losses occurred); *[Anonymous] v. Federal Deposit Ins. Corp.*, 619 F.Supp. 866 (D.D.C.1985) (interim suspension order required allegations of dishonesty or habitually disastrous banking practices). Enlightened by cases interpreting the FDI Act's prohibition section, we conclude that a prohibition order under the FCU Act which is based on a party's unfitness to serve must be supported by a finding of similar magnitude as personal dishonesty.

Therefore, we hold that the NCUA Board must provide some explanation of why Doolittle is unfit to serve as a director and officer of Bay Gulf beyond merely stating that he violated a law or regulation or breached his fiduciary duty. This justification must have weight commensurate with a finding of personal dishonesty.

### C. *Restitution Sanction*

 The NCUA Board ordered Doolittle to make restitution to Bay Gulf in the amount of $42,857, which equals Bay Gulf's losses on the Mims loans. The NCUA issued this order pursuant to 12 U.S.C. § 1786(e)(3)[2] which grants authority to the NCUA to order restitution when it finds that a party has engaged in any violation or practice that involves a reckless disregard for the law or any applicable regulations. Here, the NCUA Board determined that Doolittle's conduct in relation to the Mims loans displayed reckless disregard of NCUA regulations prohibiting credit unions from extending commercial loans to its members. 12 C.F.R. § 701.21(h) provides that a credit union shall not make business loans to its members unless the Board of Directors has adopted a written loan policy authorizing a commercial loan to that specific type of business. Bay Gulf had no policy allowing loans to the type of business run by Mims; thus, the Mims loans were made in violation of this regulation.

The NCUA Board determined that Doolittle demonstrated reckless disregard for 12 C.F.R. § 701.21(h) by failing "to take other reasonably prudent steps to insure that no further loans would be made" and by failing "to act effectively and diligently once he

---

**2.** This statute states:

(3) **Affirmative action to correct conditions resulting from violations or practices.** The authority to issue an order under this subsection and subsection (f) of this section which requires an insured credit union or any institution-affiliated party to take affirmative action to correct any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such insured credit union or such party to—

(A) make restitution or provide reimbursement, indemnification, or guarantee against loss if—

(i) such credit union or such party was unjustly enriched in connection with such violation or practice; or

(ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the Board;

(B) restrict the growth of the institution;

(C) rescind agreements or contracts;

(D) dispose of any loan or asset involved; and

(E) employ qualified officers or employees (who may be subject to approval by the Board at the direction of such Board); and

(F) take such other action as the Board determines to be appropriate.

12 U.S.C.A. § 1786(e)(3) (West 1989).

learned of the illegal loans." In particular, the NCUA adopted the ALJ's conclusion that Doolittle should have informed the Board of Directors of the unauthorized loans much sooner. Also, the NCUA Board found that Doolittle should have done more than telling only one loan supervisor to make no further loans and mark the file accordingly.

We do not agree that Doolittle's behavior manifested reckless disregard for the regulation prohibiting commercial loans. According to Doolittle's uncontroverted testimony, he took those actions which he honestly believed would remedy the problem. Mims did not default on the loans until six months later after four more loans had been made contrary to Doolittle's orders. Hindsight reveals that Doolittle could have done more to prevent Bay Gulf's exposure from increasing, but the clarity of *ex post facto* examination does not inform us as to Doolittle's mental state at the time of the alleged infraction. Doolittle's judgment proved to be unwise, but he certainly did not disregard the commercial loan interdiction.

The NCUA argues that *Brickner v. Federal Deposit Ins. Corp., supra,* is on four squares with the present case and, accordingly, we should uphold the NCUA Board's determination that Doolittle showed reckless disregard. In *Brickner,* the FDIC sought removal of bank officers pursuant to the FDI Act, 12 U.S.C. § 1818(e)(1)(C)(ii), which authorizes removal when an officer engages in an act or practice which demonstrates a continuing disregard for the soundness of the bank. The conduct in question was the officers' failure to take appropriate steps to curtail unsafe and unsound activities of a bank cashier who repeatedly disobeyed their directions to cease the activities. The officers did not disclose the continuing illicit activities of the cashier to the other directors or the FDIC until FDIC examiners discovered the activities. After determining that "continuing disregard" is akin to "reckless disregard," the court found that the officers exhibited continuing disregard because they knew for months that the cashier was "engaging in unsafe and unsound banking practices, yet they failed to disclose this knowledge to the other directors or to take suit-

able action to prevent substantial losses to the Bank." *Brickner,* 747 F.2d at 1203.

At first glance, this seems to be our case exactly, but there is a crucial distinction. In *Brickner* the officers knew that their orders were disobeyed, whereas Doolittle did not know that his instructions were defied. The *Brickner* officers knew their actions were ineffective, but failed to do more and were thus found liable for disregarding their duty to protect the bank from unsafe practices. Doolittle, by contrast, took what he reasonably thought were effective steps to curtail the extension of unauthorized loans. When he discovered that his actions were insufficient; i.e., when the loans defaulted, he informed the board of directors and the NCUA and took immediate actions to limit Bay Gulf's losses. While the *Brickner* officers disregarded their duty by knowingly failing to take effective remedial measurers, Doolittle responded to the Mims loans with actions that he believed were sufficient, even though the actions turned out to be not enough. We do not agree that Doolittle demonstrated reckless disregard of the commercial loan prohibition.

Because we find that Doolittle did not act with reckless disregard, the restitution sanction cannot stand. The legislative history of 12 U.S.C. § 1786(e)(3) supports this outcome in that it indicates that the restitution sanction is reserved for "serious misconduct." H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 392 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 188. Doolittle's poor judgment did not amount to his engaging in serious misconduct. Due to the absence of reckless disregard, we reverse the NCUA Board's order that Doolittle pay restitution to Bay Gulf.

III. Conclusion

We VACATE the NCUA Board's prohibition order and REMAND for reconsideration in accordance with this opinion. We REVERSE the NCUA Board's order that Doolittle make restitution to Bay Gulf in the amount of $42,857.