Katharina Wagner GULLY, a/k/a
Karin Gully, Petitioner,

v.

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
Respondent,

Waterside Federal Credit
Union, Intervenor.

Docket No. 02–4413.

United States Court of Appeals,
Second Circuit.

Argued: May 1, 2003.

Decided: Aug. 21, 2003.

the vessel shot high pressure water 40 feet across the room.

John M. Murdock, Epstein Becker & Green, P.C., New York, N.Y. (David J. Clark, on the brief), for Petitioner.

Eric D. Miller, United States Department of Justice, Washington, D.C. (Assistant Attorney General Robert D. McCallum, Jr. and Jacob M. Lewis, on the brief) for Respondent.

Robert J. Anello, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, N.Y. (Catherine M. Foti, on the brief), for Intervenor.

Before: WALKER, Chief Judge, MINER and McLAUGHLIN, Circuit Judges.

MCLAUGHLIN, Circuit Judge.

Petitioner Karin Gully appeals from the determination of the National Credit Union Administration Board (the "Board") that she engaged in unsafe and unsound practices and that she breached her fiduciary duty as the manager of the Waterside Federal Credit Union ("WFCU"), and is therefore unfit to be involved in the affairs of a federally-insured credit union. *See* 12 U.S.C. § 1786(g)(1)(A)-(C). The Board based this finding on Gully's failure to prevent the misuse of a WFCU corporate credit card by a WFCU board member and consultant—to wit, her father. The Board found that Gully satisfied the criteria to sustain an order permanently barring her from participating in the affairs of an insured credit union. Because of the unique circumstances of her case, however, it did not actually issue the prohibition order.

On appeal, Gully contends that the Board's legal findings were arbitrary and capricious principally because the Board employed the wrong standard in finding that she engaged in misconduct and was unfit. The Board counters that Gully lacks standing to appeal its decision principally because it never issued the prohibi-

tion order against her. The Board further contends that, even if Gully has standing, its findings should be affirmed.

We conclude that Gully does have standing to challenge the Board's conclusions. We also find that the Board's conclusions were neither arbitrary nor capricious and were supported by substantial evidence. We therefore affirm the Board's decision.

## BACKGROUND

The facts are not in dispute. The WFCU is a federally-insured credit union based in Queens. It serves Con Edison employees and has over $38 million in assets. Gully was the assistant manager of the WFCU for ten years before taking over as manager in 1992. Gully's family has a longstanding relationship with the WFCU. Her father, Reinhold Wagner, housed the WFCU in the basement of their home for twenty years, and he was a WFCU board member from the 1960s until 1998. Wagner also served as manager of the WFCU after his retirement from Con Edison in 1987.

Even after he resigned his official position at the WFCU in 1994, Wagner remained the dominant figure at the WFCU as a paid consultant and board member. He set the agenda at the board meetings, maintained the general ledger, and paid all the WFCU's bills. He was subject to virtually no oversight by any WFCU employee. WFCU personnel forwarded unopened bills to Wagner and he simply requested a check from a WFCU teller in a given amount. With rare exception, no WFCU employee actually saw the specific charges on a bill.

Unbeknownst to the other WFCU board members, Wagner held a corporate American Express card for the WFCU in his name. The card, of course, was available to Wagner for business purposes only. As with the other bills, the American Express statements were addressed to Wagner and he was generally the only person to see the detailed charges on the bill. Gully herself processed the majority of the checks for the American Express bills.

In 1996, Wagner asked Gully to pay the WFCU American Express bill because he was at his vacation home in Florida. When Gully opened the bill, she noted what appeared to be personal charges by her father. She nonetheless paid the bill. She later spoke to her father about the charges and he explained that he had used the WFCU card only because he did not have his personal card with him. Wagner told Gully that he would reimburse the WFCU for his personal charges on that bill.

Gully did not report her father's unauthorized use of the American Express card to the WFCU board, nor did she follow up to ensure that her father had reimbursed the WFCU. She did not monitor her father's subsequent use of the card to see if he continued to make personal charges. Had she done so, she would have discovered that Wagner never reimbursed the WFCU for any of his personal charges. Worse still, Wagner continued to use the WFCU card for his personal charges. Virtually every month, Wagner charged his vacation expenses, restaurant meals, and building supplies for his Florida home to the WFCU card.

A 1998 investigation by the National Credit Union Administration ("NCUA") revealed that in the preceding six years Wagner had put over $31,000 in personal charges on the WFCU card. Wagner did not contest these charges and reimbursed the WFCU over $31,000. He also consented to the entry of a prohibition order against him, banning him from participating in the affairs of any credit union. Gul-

ly herself resigned her position when Wagner's misconduct came to light.

In 2000, the NCUA focused on Gully and served her with a notice of charges stating that it would hold a hearing on whether she too should be subject to a prohibition order. Gully denied all charges. An Administrative Law Judge ("ALJ") conducted an evidentiary hearing and issued a decision recommending that no prohibition order be entered against her. Not surprisingly, the NCUA filed exceptions with the Board, contending that the ALJ's legal and factual findings were erroneous in part. Gully did not file any exceptions with the Board.

The Board concluded that during her stint as manager Gully had engaged in unsafe and unsound practices and had breached her fiduciary duty to the WFCU. Accordingly, the Board found her unfit to be involved in the affairs of an insured credit union pursuant to 12 U.S.C. § 1786(g). Specifically, the Board held that after becoming aware of her father's misuse of the WFCU's credit card, Gully had an obligation to ensure that he reimbursed the WFCU and that his personal use of the WFCU funds ceased. In the Board's view, this duty included, at the very least, reviewing future American Express bills. By failing to take any of these steps, Gully "in effect, actively participated" in her father's misconduct. Despite finding the criteria for a prohibition order satisfied, however, the Board decided not to issue such an order because of "the unique circumstances" of Gully's case and the fact that she had eventually resigned from her position as manager of the WFCU.[1]

Gully then filed a petition for review in this Court. The credit union, WFCU,

which had already successfully defended one state court action (brought by Gully for indemnification of her legal fees), intervened to protect its ongoing interest in avoiding an indemnification action by Gully. *See* N.Y. Bus. Corp. Law § 723(a) ("A person who has been successful, on the merits or otherwise, in the defense of a civil ... action ... shall be entitled to indemnification [by the corporation] as authorized [by § 722].").

## DISCUSSION

On appeal, the Board raises a threshold jurisdictional question: whether Gully has standing to bring this action in federal court. The Board contends that Gully does not have standing to challenge its conclusions because it did not actually issue a prohibition order against her.

### I. *Standing*

 Article III of the U.S. Constitution limits the jurisdiction of federal courts to the resolution of "cases" and "controversies." U.S. Const. art. III, § 2. Standing is "an essential and unchanging part" of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional minimum" of standing has three requirements. *Id.* First and foremost, the party invoking federal jurisdiction must have suffered an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the challenged conduct. *Id.* Third, "it must be likely, as opposed to merely speculative,

---

1. Although the Board's decision is not officially reported, it is available on the NCUA's website. *See In re Gully*, No. 00–0701–I, Final Dec. & Order (NCUA Bd. Jan. 30, 2002), *available at* http://www.ncua.gov/administrative_orders/00-0701-I.htm.

that the injury will be redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. 2130 (internal quotations omitted).

■■■■ "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130. Standing cannot be inferred, but "must affirmatively appear in the record." *Spencer v. Kemna,* 523 U.S. 1, 10–11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal quotations omitted).

The Administrative Procedure Act ("APA") grants a person "adversely affected or aggrieved by agency action" the right to judicial review of that action. 5 U.S.C. § 702. The Supreme Court has recognized that when a person challenges the legality of government action and that person is himself the object of the action at issue—as is the case here—"there is ordinarily little question that the action … has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130.

A. *Injury*

The Board's first contention is that Gully fails to satisfy the injury requirement of standing. It argues that Gully suffered no cognizable injury because it chose not to enter a prohibition order against her. The Board also asserts that Gully's statutory basis for jurisdiction is lacking because its decision cannot be characterized as an "order" under 12 U.S.C. § 1786(j)(2). Finally, despite acknowledging that reputational injury is sufficient to establish standing in some cases, the Board posits that Gully's alleged reputational injury is too vague to constitute an injury in fact. Each of these contentions lacks merit.

■■■■ As a threshold matter, the Board's attempt to characterize its decision as something other than an "order" is unpersuasive. Section 1786(j) provides that any party subject to a disciplinary hearing under that section may obtain review of "*any order*" issued by the Board. 12 U.S.C. § 1786(j)(2) (emphasis added). While "order" itself is not defined in the statute, § 1786(j)(1) does require the Board to issue "an order or orders" after every hearing. Therefore, despite the alleged lack of a document formally denominated as an order, we conclude that a "decision" of the Board is subject to judicial review by a party who, like Gully, is the subject of a disciplinary hearing.

Apart from the semantic quibble, there is in fact one formally designated "order" in the record. The Board fashioned its decision in Gully's case as an order. Under the section of its decision entitled "Conclusion and Order", the Board stated:

> it is **Hereby ordered**, that the conduct of Respondent Katharina Wagner Gully, as manager of [WFCU], was sufficient to sustain an order permanently prohibiting her from participating in any manner in the conduct of the affairs of any insured credit union.

The Board then proceeded to issue a second order, stating that it would not issue a formal prohibition order against Gully. Given the Board's repeated references to its decision as an order, its argument that the decision was not an appealable order is rejected.

Equally unavailing is the Board's contention that Gully suffered no cognizable injury because there is no prohibition order against her. Contrary to the Board's belief, a prohibition order is not a sacred talisman that must always be present to establish an injury. The Supreme Court has long recognized that an injury to reputation will satisfy the injury element of standing. *See, e.g., Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 139, 71 S.Ct. 624, 95 L.Ed. 817 (1951)

(charitable organizations designated as "Communist" by Attorney General had standing to challenge their designations because of, *inter alia,* "damage [to] the reputation of th[e] organizations in their respective communities"); *Meese v. Keene,* 481 U.S. 465, 472–77, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (potential distributor of foreign films had standing to challenge Justice Department's characterization of films as "political propaganda" since it would affect "his personal, political, and professional reputation" and impair his ability to practice his profession); *accord United States v. Accra Pac, Inc.,* 173 F.3d 630, 633 (7th Cir.1999) ("being put on a blacklist ... is treated as immediately redressible harm because it diminishes (or eliminates) the opportunity to practice one's profession even if the list ... does not impose legal obligations").

Several circuit courts have found reputational injury sufficient to establish "injury in fact" in cases quite similar to this case. For example, the D.C. Circuit held that a District Judge had standing to challenge a public reprimand he received from the Judicial Council of the Fifth Circuit for engaging "in a pattern of abusive behavior." *McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States,* 264 F.3d 52, 57 (D.C.Cir.2001) (internal quotations omitted), *cert. denied,* 537 U.S. 821, 123 S.Ct. 99, 154 L.Ed.2d 29 (2002). The reprimand, which was published on the Fifth Circuit's website, had no legal effect on the judge, but was, of course, a blight on his reputation. In concluding that the judge's reputational injury established a cognizable "injury in fact" under *Meese v. Keene,* the D.C. Circuit relied solely on the serious effect of the reprimand on the judge's reputation. *Id.* at 57.

It is self-evident that Gully's reputation will be blackened by the Board's finding of misconduct and unfitness. One need not be a sage to recognize that the Board's findings are a death knell for Gully's career in an industry dependent on security and reliability. *Cf. Southern Mut. Help Ass'n v. Califano,* 574 F.2d 518, 524 (D.C.Cir.1977) ("It is not difficult to imagine the inhospitable reception that would be given to future applications from an organization that has been accused of violating departmental regulations, misusing grant funds, and engaging in activities that create conflicts of interest.").

**B. *Causation***

■ The Board also challenges the second standing requirement of Article III. It contends that any harm to Gully's reputation was caused, not by its legal conclusions of misconduct and unfitness, but by her own failure to prevent her father's continued misuse of WFCU funds. This is simply too facile. It is the Board's *determination,* not Gully's reprehensible conduct, that has sullied her reputation in the credit union industry. Without the Board's decision, Gully would not have to shake the albatross of an official finding that she engaged in misconduct and is unfit to be involved in the affairs of a credit union. That is sufficient causation.

**C. *Redressability***

■ Finally, the Board maintains that any reputational injury to Gully cannot be redressed by a favorable decision from this Court. It is difficult to comprehend this argument. A finding that Gully did not breach her fiduciary duty to the WFCU, did not engage in unsafe and unsound practices, and is fit to participate in the affairs of a credit union would remove the stain on Gully's professional record. This

is sufficient to establish redressability. *Meese,* 481 U.S. at 477, 107 S.Ct. 1862.

■ In sum, Gully has satisfied all the standing requirements to challenge the Board's conclusions that she committed misconduct and was unfit to serve.

## II. *The NCUA Board's Decision*

Turning to the merits of Gully's appeal, the crux of her argument is that the Board failed to apply the correct legal standard when it made its misconduct and unfitness determinations. More specifically, Gully claims that scienter and culpability are essential to a finding of misconduct and unfitness under 12 U.S.C. § 1786(g)(1). In light of the plain language of § 1786(g)(1), this contention is extravagant.

## A. *Standard of Review*

■ Our review of the Board's decisions is governed by the APA, 5 U.S.C. § 706. *See* 12 U.S.C. § 1786(j)(2). Under the APA, the Board's conclusions must be affirmed unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotations omitted). "The task of the reviewing court under th[e arbitrary and capricious] standard is to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made." *J. Andrew Lange, Inc. v. FAA,* 208 F.3d 389, 391 (2d Cir.2000) (internal quotations omitted). Our review under these standards is narrow and "particular-ly deferential." *Erie–Niagara Rail Steering Comm. v. Surface Transp. Bd.,* 247 F.3d 437, 441 (2d Cir.2001).

## B. *Prohibition Orders Under the Federal Credit Union Act*

Federal credit unions are governed by the Federal Credit Union Act ("FCUA"), 12 U.S.C. §§ 1751–1795K, and administered by a federal agency, the NCUA, *id.* § 1752a(a). The NCUA is managed by the Board. *Id.* The FCUA authorizes the Board to issue orders barring a credit union officer or employee from further participation in the affairs of a federally insured credit union. *Id.* § 1786(g). A prohibition order must be buttressed by a finding that a credit union official (1) is guilty of misconduct; (2) that has an adverse effect on the credit union; and (3) evinces personal dishonesty or unfitness. *Id.* (the "prohibition test").

● The misconduct element is satisfied when it is found that a party has "engaged or participated in any unsafe or unsound practice," or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." *Id.* § 1786(g)(1)(A)(ii), (iii).

● The adverse effect element is established when, as a result of a party's misconduct, a credit union "has suffered or will probably suffer financial loss or other damage." *Id.* § 1786(g)(1)(B)(i).

● The final element of the prohibition test requires a finding that a party's conduct "involves personal dishonesty" or "demonstrates such party's unfitness to serve as a director or officer of, or to otherwise participate in the conduct of the affairs of, an insured credit union." *Id.* § 1786(g)(1)(C)(i),(ii).

Here, Gully concedes, as she must, that the second element (adverse effect) was

satisfied by the WFCU's loss of over $31,000 during the course of her father's misuse of the corporate credit card. The Board, however, made no finding of personal dishonesty on Gully's part. Thus, the issue is distilled to whether Gully was guilty of *misconduct* that rendered her *unfit* to serve as a fiduciary in a credit union.

## C. § 1786(g)(1) Requires Neither Scienter Nor Culpability

Gully's central argument on appeal is that 12 U.S.C. § 1786(g)(1) requires a finding of scienter and culpability. Gully does not cite a single case—nor has this Court unearthed one—to support her novel hypothesis.

Gully relies on language from the legislative history of § 1786(g) for support. *See* H.R. Rep. 101–54(I), at 392 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 188 (noting, without further explanation, that "a banking agency will have to prove some scienter by the culpable individual"). Gully also attributes great weight to case law interpreting the prohibition provision of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1818(e)(1), which Gully insists is analogous to § 1786(g)(1) and should therefore be interpreted "interchangeab[ly]." Petr.'s Br. at 15 n. 4.

Gully's thesis suffers from two fatal flaws. First, the isolated statement in the House Report upon which Gully relies cannot trump the text of § 1786(g)(1). *See, e.g., Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("The starting point for [the] interpretation of a statute is always its language."). The plain language of § 1786(g)(1) makes clear that no finding of scienter or culpability is required to satisfy any of the prohibition test elements. Given the plain, unambiguous language of the text, it is

well settled that we cannot resort to legislative history to glean a statute's meaning. *See, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("When the words of a statute are unambiguous ... 'judicial inquiry is complete.' "). It is clear from the text alone that neither scienter nor culpability is required to satisfy § 1786(g)(1).

Second, Gully's reliance on the prohibition provision of the FDIA provides no support for her argument because it is materially different from § 1786(g)(1). Unlike § 1786(g)(1)(C), which, as described above, is satisfied by a finding of personal dishonesty or unfitness, the FDIA requires that a party's conduct demonstrate "personal dishonesty" or "*willful or continuing disregard* ... for the safety or soundness of such insured depository institution." 12 U.S.C. § 1818(e)(1)(C)(i)-(ii) (emphasis added). Not surprisingly, courts have concluded that "willful or continuing disregard" requires a heightened showing of scienter. *See, e.g., Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054–55 (9th Cir.1994) (collecting cases).

The FDIA decisions do not help Gully. Had Congress intended a heightened showing of scienter to apply to the FCUA, it would have drafted the prohibition provisions of the FDIA and FCUA identically. Congress's use of different standards for the issuance of prohibition orders pursuant to the FDIA and FCUA is quite telling. *See Rodriguez v. United States*, 480 U.S. 522, 525, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted). Therefore, since § 1786(g)(1) and § 1818(e)(1) were created by the same Act—the Financial

Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183—the cases that Gully cites interpreting the FDIA are inapposite.

### D. *Gully's Liability Under § 1786(g)(1)*

Gully's final contention is that there is no reasonable construction of the Board's factual findings—which she does not contest—from which it can be concluded that she was guilty of misconduct or is unfit to be involved in the affairs of a credit union. We disagree.

### 1. *Misconduct*

The Board found that Gully's failure to follow up once she became aware of her father's misuse of the WFCU American Express card constituted both an unsafe and unsound practice and a breach of her fiduciary duty. The Board has traditionally interpreted unsafe and unsound practice to mean "conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder." *See Doolittle v. NCUA,* 992 F.2d 1531, 1538 (11th Cir.1993). The Board here defined fiduciary duty as a "duty to act in the best interest of the institution, its shareholders and its depositors." *See In re Majette,* Final Dec. & Order (NCUA Bd. Mar. 18, 1999).

 The parties agree that New York law applies to Gully's claim of breach of fiduciary duty and that the WFCU is considered a corporation for purposes of New York fiduciary law. Under New York law, a director or officer of a corporation owes a fiduciary duty to the corporation. *See* N.Y. Bus. Corp. Law § 715(h) (corporate officer "shall perform his duties ... in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances"). New York courts have long held fiduciaries to a standard "stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is ... the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, *C.J.*). A corporate officer's fiduciary duty includes discharging corporate responsibilities "in good faith and with conscientious fairness, morality and honesty in purpose" and displaying "good and prudent management of the corporation." *Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984) (internal quotations omitted). New York's fiduciary law is therefore consistent with the standard used by the Board in its decision.

Applying these standards, we cannot say that the Board's conclusions that Gully breached her fiduciary duty to the WFCU and engaged in unsafe and unsound practices were arbitrary and capricious. On the contrary, the Board's conclusions were supported by substantial evidence in the record. Gully concedes that, after becoming aware of her father's improper charges on the WFCU credit card and asking him to reimburse the WFCU, she made no effort to ensure that his misconduct was corrected and that it did not continue in the future. It is therefore difficult to dispute the Board's conclusion that by failing to exercise reasonable diligence Gully "in effect, participated in h[er father's] scheme" by continuing to send the American Express bills to him unopened and processing payment checks without ever reviewing the bills.

 Indeed, a prudent person charged with protecting the assets of an insured credit union would not, as Gully did, blithely accept the promise of a consultant to repay the credit union and to stop misusing the credit card after discovering his illegal misuse of the credit card. Gully's

conduct was particularly egregious in light of the complete lack of internal controls at the WFCU to prevent her father's continued misuse of his credit card and the conflict of interest that Gully had in policing her own father. In light of these facts, the Board's conclusions that Gully engaged in unsafe and unsound practices and breached her fiduciary duty were indeed reasonable.

Despite the substantial evidence supporting the Board's legal conclusions, Gully maintains that the Eleventh Circuit's decision in *Doolittle v. NCUA, supra,* calls into question the Board's decision. Her reliance on *Doolittle,* however, is misplaced.

In *Doolittle,* the Board entered a prohibition order against the president of a credit union after finding that he breached his fiduciary duties and engaged in unsafe and unsound practices by failing to report certain unauthorized commercial loans made by a loan supervisor to a credit union member. After learning of the loans, Doolittle called a meeting with the supervisor, the member, and other credit union personnel and informed the supervisor not to make any more commercial loans to the member. The supervisor ignored Doolittle's admonition and continued to make loans to the member. The member eventually defaulted on these loans, causing a loss to the credit union. *Doolittle,* 992 F.2d at 1535.

In rejecting the Board's findings that Doolittle breached his fiduciary duty and engaged in unsafe and unsound practices, the Eleventh Circuit noted that Doolittle "took steps that he judged to be sufficient to prevent further escalation of the situation" and "cannot be held to have breached his fiduciary duty simply because his underlings failed to follow his orders." *Id.* at 1537. The court also emphasized that "[t]his is not a case where a fiduciary ...

stood idle and allowed damage to increase." *Id.*

As the Board recognized in its decision, Doolittle was not Gully. First and foremost, the underlying wrongdoing by Doolittle did not involve any personal gain to him or a relative. Here, the underlying wrongdoing involved substantial personal gain to Gully's father. Second, the corrective action taken by the credit union officer in *Doolittle* was far more extensive than that taken by Gully. Doolittle called a meeting with all the parties involved, including his subordinate personnel, in an effort to end the wrongdoing. In contrast, Gully conducted no investigation into her father's past or future misuse of the card. Her corrective action consisted solely of speaking to her father about his wrongdoing. Considering her conflict of interest and the complete lack of controls in the WFCU bill processing department, Gully's failure to inform any other WFCU personnel of her father's misconduct stands in stark contrast to the conduct in *Doolittle.*

Third, the Eleventh Circuit found that Doolittle's behavior did not constitute conduct traditionally considered to be a breach of fiduciary duty. Here, however, failing to monitor another party's actions has been considered a breach of fiduciary duty. *See, e.g., Hoye v. Meek,* 795 F.2d 893, 895–96 (10th Cir.1986) (bank director's failure to monitor an agent—his son—held to be a breach of fiduciary duty); *Ault v. Soutter,* 204 A.D.2d 131, 611 N.Y.S.2d 187, 187 (1st Dep't 1994) (corporate director breached his fiduciary duty by "failing to do more than passively rubber-stamp" the actions of a fellow corporate fiduciary).

Finally, unlike Doolittle, Gully indeed "stood idle and allowed damage to increase." After discovering her father's misuse of the WFCU credit card, Gully failed to follow through on her obligation

to protect the assets of the WFCU. The Board's finding that Gully's conduct was more egregious than Doolittle's is reasonable and supported by substantial evidence.

### 2. *Unfitness*

Gully also contends that the Board's finding that she was unfit to serve a credit union was arbitrary and capricious because the Board: (1) did not make a factual finding about her ability; and (2) failed to make an unfitness determination that is "of equal gravity" to a finding of personal dishonesty. *Doolittle*, 992 F.2d at 1538.

■ The Board defined unfitness as "unsuitable, incompetent, or not qualified to participate in the conduct of the affairs of an insured credit union." *In re Doolittle*, Dec. & Order on Remand (NCUA Bd., Jan. 19, 1995). This definition is entirely consistent with the text of § 1786(g)(1)(C)(ii). The Board made a reasonable determination that Gully's failure to take adequate corrective action to end her father's unlawful use of WFCU funds demonstrated her unfitness to fulfill her responsibilities as the manager of a federal credit union.

Gully faults the Board for failing to make any finding regarding her ability. Gully's only support for this contention is an out-of-context factual finding by the Board. When confronted with the ALJ's factual determination that Gully was "known as an honest person and capable manager," the Board added the following proviso: "The Board recognizes this as [the] opinion of certain witnesses and makes no finding of fact as to [Gully's] honesty or ability." This statement merely stressed that the Board was not endorsing the testimony of the witnesses who claimed that Gully was generally honest and able. Gully's argument also ignores that after this statement, the Board proceeded to make detailed findings of fact

that supported its conclusion that Gully was unfit under § 1786(g)(1)(C).

■ Gully's assertion that unfitness requires a finding of equal gravity to personal dishonesty is likewise unpersuasive. Gully relies again on the Eleventh Circuit's decision in *Doolittle, supra,* as authority for this proposition. She fails to recognize, however, that there is no textual support for this interpretation of the unfitness element. Furthermore, Gully ignores that it is the Board, not federal courts, that has been entrusted with the power to make determinations regarding the gravity of misconduct by credit union officials. *See* 12 U.S.C. § 1786(g)(1).

In sum, the Board's conclusions that Gully breached her fiduciary duty to the WFCU, and that her conduct constituted an unsafe and unsound practice and demonstrated her unfitness to participate in the affairs of a credit union were neither arbitrary nor capricious and were supported by substantial evidence.

### CONCLUSION

For the foregoing reasons, the Board's decision is AFFIRMED.