■ THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT
SPITZER, as Attorney General, Respondent, v RICHARD A. GRASSO
et al., Defendants, and KENNETH G. LANGONE, Appellant. (And
Other Actions.) [858 NYS2d 23]—

Order, Supreme Court, New York County (Charles E. Ramos,
J.), entered August 4, 2006, which denied defendant Kenneth
Langone's motion for summary judgment dismissing the
complaint as against him, affirmed, without costs.

The Attorney General brought this action to challenge
compensation and benefits awarded to the former CEO of the
New York Stock Exchange (NYSE), Richard Grasso. A detailed
discussion of the background of the litigation and the substance
of the complaint is set forth in our decision in *People v Grasso*
(42 AD3d 126 [2007]).

This appeal is from the denial of defendant Kenneth G.
Langone's motion for summary judgment to dismiss the seventh
cause of action. In that claim, the Attorney General alleges that
defendant Langone, a NYSE director and chair of its Compensa-
tion Committee from June 1999 until May 2003, breached his
fiduciary duties to the NYSE by failing to make complete and
accurate disclosures of Grasso's compensation to the NYSE
Board of Directors.[1]

In the early 1990s, the NYSE Compensation Committee
determined that the Exchange was at a competitive disadvan-
tage because it was unable to offer its senior executives stock-
based forms of deferred compensation. To remedy this
problem, in 1997, the Board of Directors approved the NYSE's
Capital Accumulation Plan (CAP) for four of its most senior
executives. Originally CAP provided a 25% match of variable
compensation awards for eligible executives in a given year.

---

1. Members of the NYSE Compensation Committee were all members of
the NYSE Board of Directors.

The variable compensation to which it applied was the NYSE's Incentive Compensation Plan (ICP) and its Long Term Incentive Plan (LTIP). CAP payments were deferred until retirement or termination.

In May 1999, the NYSE Compensation Committee and Board of Directors approved, and Grasso executed, his second employment agreement as chairman and CEO of the NYSE. The 1999 agreement modified Grasso's 1995 contract and extended his term to May 31, 2005. In fact, Grasso's 1999 employment agreement set forth five components of his annual compensation, which, for the first time included CAP. These were: (1) a base salary of $1.4 million; (2) a discretionary ICP bonus with a minimum target amount of $1 million annually; (3) a LTIP award; (4) a CAP award equal to 50% of his total variable compensation (ICP and LTIP); and (5) a Supplemental Executive Retirement Plan (SERP) award.

The annual compensation for all of the NYSE senior executives was set each February for the prior calendar year. Between the 1997 institution of CAP awards and Grasso's 2003 resignation, the process for setting executive compensation was as follows: Frank Ashen, the head of human resources, would collect median target compensation for a group of comparator companies from NYSE's compensation consultant, Hewitt Associates. He would also prepare a summary of each NYSE executive's performance for the year, based upon input from operating managers. Next, Ashen compared his raw data against 65 quantitative measurements to reach a score for each executive. That score comprised 65% of the individual's compensation. The chair of the Compensation Committee then had discretion to determine the remaining 35% of compensation figures. Thus, during his tenure as chair of the Compensation Committee, Langone was directly responsible for determining 35% of the compensation of NYSE executives. Also, he interacted with the NYSE Department of Human Resources by making his yearly proposals to Frank Ashen. After the chair made his recommendations, Ashen met individually with each of the members of the Compensation Committee to present and discuss the salary proposals. On the first Thursday of each February, the Compensation Committee would meet for a collective discussion and vote on all of the executives' compensation. Later that same day, the full Board of Directors would meet and vote on the same matters. It was the role of the Compensation Committee chair to make oral presentations to the Committee and the full Board before they voted.

The first time the Board of Directors had to approve CAP awards was in February 1998. The written materials prepared for the 1998 and 1999 Compensation Committee meetings, under the leadership of then chair Bernard Marcus, provided the Committee Members with worksheets that gave an exact value of the recommended CAP award for each participant. The "total compensation" column of those worksheets also displayed the recommended sum of each executive's base salary, ICP, LTIP and CAP award for the year. For example, the 1997 salary worksheet for Robert Britz, a NYSE executive vice-president who received a 25% CAP award, contained the following information (emphasis supplied):

|  | Base Salary | ICP | LTIP | CAP | Total Compensation |
|---|---|---|---|---|---|
| Comparator Median Target | $400,000 | $246,781 | $640,020 | — | $1,113,458 |
| 1996 Actual | $400,000 | $350,000 | No Payout | — | $750,000 |
| 1997 Recommended | $435,000 | $410,000 | No Payout | 102,500[2] | $947,500 |

After Langone became chair of the Compensation Committee in June 1999, the values of recommended CAP awards were removed from the worksheets distributed to Committee members. In addition, the values for "total variable compensation" and "total compensation" no longer included the recommended CAP awards. For example, the worksheet outlining Grasso's recommended 1999 compensation was as follows:

|  | Base Salary | ICP | LTIP | Total Compensation | Total Variable Compensation |
|---|---|---|---|---|---|
| 1998 | $1,400,000 | $4,204,000 | $396,000 | $6,000,000 | $4,600,000 |
| 1999 | $1,400,000 | $5,652,000 | $948,000 | $8,000,000 | $6,600,000 |

Grasso's February 2000 recommended 1999 compensation worksheet had the following statement underneath the chart: "Grasso will receive 50% of his variable compensation in the Capital Accumulation Plan." However, the document did not give a value for his 1999 CAP award, which was $3,300,000. The worksheet similarly failed to set forth that his actual recommended compensation was $11,300,000.

After the Committee voted to approve Grasso's compensation, a worksheet quantifying all of the components of Grasso's compensation, including the CAP award, and their sum total,

---

2. Britz's CAP award was 25% of his variable compensation.

was sent to the NYSE CFO to effect payment:

| | Base Salary | ICP | LTIP | Variable Compensation | Total Cash Compensation | CAP | Total Compensation |
|---|---|---|---|---|---|---|---|
| 1998 | $1,400,000 | $4,204,000 | $396,000 | $4,460,000 | $6,000,000 | —[3] | $6,000,000 |
| 1999 | $1,400,000 | $5,652,000 | $948,000 | $6,600,000 | $8,000,000 | $3,300,000 | $11,300,000 |

Dale Bernstein, the deputy head of NYSE's Human Resources Department, testified at her deposition that it was her job to prepare the worksheets of executives' compensation. She related that after Langone became chair of the Compensation Committee, Frank Ashen told her to remove the CAP column from the materials distributed to the Compensation Committee. Bernstein stated that she told Ashen that she thought the worksheets were clearer with the CAP awards displayed. However, she testified that she deferred to Ashen, who told her that Grasso did not want the CAP columns displayed. Thus, from February 2000 to February 2003, the materials distributed to the Compensation Committee did not have a CAP column. Bernstein stated that after the compensation packages were approved, she gave the finance division worksheets which displayed the values of CAP and total compensation figures.

In February 2000, the Compensation Committee[4] was given materials indicating that Grasso's total 1999 compensation was $8 million, notwithstanding that his actual total compensation was $11.3 million. The minutes from the February 2000 Compensation Committee meeting do not indicate that Grasso's CAP award was discussed. However, speaking points prepared for Langone's remarks at the February 3, 2000 Board meeting indicate that Langone specifically told the Board that Grasso's 2000 CAP award was $3.3 million.

One member of the Compensation Committee, D. Maughan, testified at his deposition that the worksheet he was given at the February 2000 Committee meeting would have been clearer if it included a CAP column and a "real total compensation" figure. Two other members of the Compensation Committee gave deposition testimony that they thought Grasso had been awarded approximately $8 million in total compensation for 1999, when in fact, the actual total compensation approved for Grasso in 1999 was $11.3 million. Notably, the $3.3 million discrepancy was the exact value of the CAP award (which, again, was not disclosed on the compensation worksheet). However, four Board members (M. Karmazin, L. Wachner, G. Levin, and

---

3. Grasso was not eligible for a CAP award until after the execution of the 1999 employment agreement.

4. The 1999 Compensation Committee (as of June 1999) included: K. Langone (chair), C. Bocklet, R. Fuld, M. Greenberg, M. Karmazin, D. Komansky, C. Marshall, D. Maughan, A. Trotman, and L. Wachner.

R. Murphy), testified at their depositions that it was clear to them, before they voted, that Langone was recommending that Grasso receive a $3.3 million CAP award for 1999.

Similar to the format for the prior year, the February 2001 worksheet for Grasso's compensation indicated a recommended "total 2000 Cash Comp" of $15 million.

|  | Base Salary | ICP | LTIP | Variable Comp | Total Cash Comp |
|---|---|---|---|---|---|
| 1999 | $1,400,000 | $5,652,000 | $948,000 | $6,600,000 | $8,000,000 |
| 2000 | $1,400,000 | $12,519,000 | $1,081,000 | $13,600,000 | $15,000,000 |

The 2001 and 2002 worksheets added the word "also" to the CAP statement under the chart. They both stated: "Grasso will also receive 50% of his variable compensation in the Capital Accumulation Plan." However, the February 2001 worksheet did not reveal: (1) that Grasso's 2000 recommended CAP award was $6.8 million, (2) that a $5 million special award was recommended for Grasso for 2000; or (3) that Grasso's total recommended compensation for 2000 was $26.8 million. The minutes from the February 2001 Compensation Committee meeting do not indicate that Grasso's CAP award was discussed. C. Bocklet, a member of the Compensation Committee,[5] testified at his deposition that he believed that Grasso's total 2000 compensation was $15 million. This was the value in the "total compensation" column of the worksheet, not the $26.8 million Grasso was actually awarded.

The same procedures were followed in February 2002. The worksheet given to the Committee was as follows:

|  | Base Salary | ICP | LTIP | Variable Comp | Total Cash Comp |
|---|---|---|---|---|---|
| 2000 | $1,400,000 | $12,519,000 | $1,081,000 | $13,600,000 | $15,000,000 |
| 2001 | $1,400,000 | $10,600,000 | N/A | $10,600,000 | $12,000,000 |

The notations under the chart on the February 2002 worksheet indicated that: (1) Grasso would also receive a CAP equal to 50% of his variable compensation; (2) in February 2001, Grasso was granted a special award of $5,000,000; and (3) in February 2002 Mr. Grasso was proposed for a special award of $10,500,000. Thus, the worksheet (including the table and the proposed $10.5 million special award) itemized a recommended compensation for Grasso of $22.5 mil-

---

**5.** The 2000 Compensation Committee (as of June 2000) included: K. Langone (chair), C. Bocklet, R. Fuld, M. Greenberg, M. Karmazin, D. Komansky, A. Trotman, and L. Wachner.

lion in 2001.[6] Again, neither Langone's speaking points nor the Compensation Committee minutes indicate a discussion of Grasso's CAP award. Thus, the actual value of Grasso's proposed compensation for 2001, including the $8.05 million CAP award, was $30.55 million.

Compensation Committee member R. Murphy, and Board members W. Harrison and J. Duryea all testified at their depositions that they believed they had voted to approve 2001 compensation for Grasso in the $20 million range. C. Bocklet and R. Murphy also testified that the members of the NYSE would not be happy if they knew that the Compensation Committee was approving paying Grasso $30 million for his work in 2001.

Grasso's employment contracts also entitled him to a lump-sum Supplemental Executive Retirement Plan (SERP) distribution upon his departure from the NYSE. This SERP award was determined based upon the length of his service at the NYSE and the amount of his variable compensation during that time. In the summer of 2002, Grasso sought to extend his contract and accelerate payment of some of his deferred compensation. The Compensation Committee held a special meeting during which some members first learned that Grasso's SERP would be $152 million as of the date of his projected retirement. The Committee was concerned about the rapid, substantial growth of Grasso's deferred compensation, and they decided that a third party should be retained to review the issue. Langone hired Vedder, Price, Kaufman & Kammholz, a consulting firm, for this purpose. Vedder, Price requested a copy of the materials provided to the Compensation Committee for their February 2002 meeting. However, Ashen provided Vedder, Price with the worksheets that were prepared for the CFO; namely, those which included the actual recommended CAP awards and compensation totals incorporating CAP awards, rather than the worksheet provided to the Committee, which did not display these figures.

Grasso then made a proposal to cap his final pay at $12 million, extend his contract to 2006, and to move $56 million of his accrued SERP benefit into his Supplemental Executive Savings Plan (SESP). The Compensation Committee considered this proposal, because it would lessen the NYSE's accrual expenses, but it made no determination on the matter. Then, in January 2003, Grasso revised his proposal to request the immediate pay-

---

**6.** The 2001 Compensation Committee (as of June 2001) included: K. Langone (chair), R. Fuld, M. Greenberg, M. Karmazin, D. Komansky, G. Levin, R. Murphy, and A. Trotman.

ment of approximately $140 million in deferred compensation, including more than $11 million in CAP benefits.

At its February 2003 meeting, the Compensation Committee was given worksheets which included, for the first time under Langone's leadership, a figure for Grasso's proposed CAP award. The "Total Compensation" figures in this worksheet also included, again, for the first time under Langone's leadership, the CAP awards. Thus, the format of the February worksheet was inconsistent with those distributed to the Compensation Committee in February 2000, February 2001, and February 2002.

| | Base Salary | ICP | LTIP | Variable Comp | Total Cash Comp | CAP | Total Compensation |
|---|---|---|---|---|---|---|---|
| 2000 | $1,400,000 | $12,519,000 | $1,081,000 | $13,600,000 | $15.000,000 | $6,800,000 | $21,800,000 |
| 2001 | $1,400,000 | $16,100,000 | N/A | $16,100,000 | $17,500,000 | $8,050,000 | $25,550,000 |
| 2002 | $1,400,000 | $7,066,000 | N/A | $7,066,666 | $7,066,666 | $3,533,333 | $12,000,000 |

Grasso's recommended total compensation for 2002 was $12 million. The minutes from the February 2003 Compensation Committee meeting also indicate the disclosure and approval of Grasso's CAP award. However, the Compensation Committee did not vote to approve Langone's recommendation, but referred it for further study of the financial implications for the NYSE.

On August 27, 2003 Grasso executed his third employment agreement with the NYSE. The same day the NYSE issued a press release revealing that $139.5 million would be immediately payable to Grasso. The press release did not reveal that $48 million was also due to be paid Grasso upon his retirement. In September 2003, the Chairman of the Securities and Exchange Commission contacted the NYSE and requested information concerning Grasso's compensation. In response to increasing internal and external pressure, Grasso agreed to forgo future benefit payments. Several weeks later, he resigned.

The Attorney General then brought this action. The complaint alleges that the NYSE paid Grasso an unlawful amount of compensation and seeks the return of such sums to the NYSE. The seventh cause of action alleges that as an officer of the NYSE and chair of its Compensation Committee, Langone violated N-PCL 717 (a) by, "among other things," misleading the Board about the CAP awards. Paragraph 207 of the complaint quotes the relevant portion of N-PCL 717 (a), a codification of the fiduciary duty owed by all officers and directors of not-for-profit corporations. That section provides in pertinent part: "Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of dili-

gence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." (*Id.*) In paragraph 208 of the complaint, the Attorney General asserts that as chair of the Compensation Committee, Langone breached his fiduciary duties under section 717 (a) by misleading its Board of Directors, "which had delegated to him the task of explaining the proposed compensation." Langone's digressions, the complaint continues, are actionable under N-PCL 720 (b)[7] and 720 (a) (1).[8]

After substantial discovery, including 61 depositions and the exchange of approximately one million documents, Langone moved for summary judgment dismissing the seventh cause of action. Langone asserted that he was falsely accused of misleading the NYSE Board as to Grasso's CAP award. He averred that he personally disclosed Grasso's CAP program to the Board and was present for similar disclosures by others. He stated that Grasso's $3.3 million 1999 CAP award was disclosed to the Board at their February 2000 meeting. Langone also asserted that his presentations in 2001 and 2002 fairly and accurately represented all of the components of Grasso's compensation. He claimed that the "undisputed facts" demonstrated that "[he] and others repeatedly disclosed Grasso's CAP awards, both orally and in writing." Langone's motion contained 45 exhibits. These included Langone's speaking points for various Board meetings, minutes from February 1997, 1999-2002 Compensation Committee meetings, excerpts from the deposition testimony of various Board members, and salary worksheets for the 2000-2002 Compensation Committee meetings. In support of Langone's contention that the Board was fully informed about Grasso's CAP awards, his counsel also annexed, as required by rule 19-a of the Rules of the Commercial Division of the Supreme Court (22 NYCRR 202.70 [g]), a 23-page "Statement of Material Undisputed Facts."

---

**7.** N-PCL 720 (b) authorizes the Attorney General to bring an action against an officer or director of a not-for-profit corporation under N-PCL 720 (a) (1).

**8.** N-PCL 720 (a) provides that

"[a]n action may be brought against one or more directors or officers of a corporation . . .

"(1) To compel the defendant to account for his official conduct in the following cases:

"(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

"(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

In opposition, the Attorney General submitted excerpts from the depositions of 26 individuals, including Board members, NYSE employees, Grasso and Langone. He also presented 58 exhibits, a 14-page response disputing aspects of Langone's "Statement of Material Undisputed Facts," and a 32-page "Counter-Statement of Material Undisputed Facts." The Attorney General's submissions pointed to the necessity of annual disclosure of the CAP awards. The Attorney General also submitted excerpts from the deposition testimony of a number of the Board members, including Deryck Maughan, Charles J. Bocklet, David Komansky, James Duryea, William Harrison, Robert Murphy, and H. Carl McCall. These witnesses' testimony, much of which is set forth in the factual recitation, indicated misconceptions as to the magnitude of the compensation that they had voted to approve for Grasso in February 2000—February 2002.

In reply, Langone submitted 29 additional exhibits, including documents and deposition testimony. These were to establish that Langone met his duty to fully inform the Board about Grasso's compensation.

At oral argument and on the record, before deciding the motion, the IAS court inquired as to why, upon Langone's succession to leadership as chair of the Compensation Committee, compensation worksheets circulated to the Committee members no longer itemized the exact values of CAP awards. Langone's counsel responded that his client had nothing to do with the formatting of the worksheets shown to the Compensation Committee, and that he should not be faulted for those documents' failure to disclose the CAP awards. The Attorney General countered that Langone was the only NYSE director who interacted with the Department of Human Resources, and that he was also responsible for recommending compensation to the remaining members of the Compensation Committee. The Attorney General added that in his role as chair of the Compensation Committee, Langone had a duty to ensure that the Committee was provided with a complete and accurate presentation of proposed compensation.

Langone's counsel then asserted that the speaking points from the February 2000 Compensation Committee meeting showed, unequivocally, that Langone disclosed the exact amount of Grasso's recommended CAP award to the Committee. However, the Attorney General produced evidence that Grasso's CAP award was not included in Langone's speaking points for the February 2001 or 2002 meetings. The Attorney General also asserted that there was no evidence that the exact values of

Grasso's 2000 or 2001 CAP awards were disclosed to any member of the Compensation Committee or the Board prior to voting to approve his compensation packages.

The IAS court denied Langone's motion. It found issues of fact as to whether Langone breached his duties to the Board. The court held that the worksheets omitting the exact values of Grasso's CAP awards constituted evidence that Langone may have breached his obligation to fully and accurately disclose his salary recommendations to the Board. The court noted that Langone's speaking points for Compensation Committee meetings were inconsistent from year to year. The court also observed that Board members' deposition testimony indicated that some directors were not aware of the magnitude of the total compensation that they were approving for Grasso.

On appeal, Langone contends that the Attorney General failed to raise an issue of fact as to the claim that he violated his fiduciary duties. He asserts that he had no duty to annually remind the Compensation Committee that it had approved a 50% CAP award for Grasso, and that even if he had such a duty, the undisputed facts reveal that he fulfilled it. Langone also claims that the element of causation has not been met because no Board members could have "reasonably relied" upon the worksheets to conclude that Grasso was not entitled to his contractual CAP award. Finally, Langone contends that any claims which rely upon his purported failure to apprise the Board of Grasso's SERP awards were not pleaded in the complaint, and cannot be a basis for a determination that Langone breached his duties.

In response, the Attorney General asserts that Langone had a duty to disclose Grasso's compensation to the Committee and the Board. He claims that the record is replete with evidence that Langone did not fulfill his obligations, and that his failures led the Board to vote in favor of compensation packages which were substantially higher than what they had understood. The Attorney General asserts that omissions regarding Grasso's CAP and SERP both preclude summary judgment in favor of Langone.

Pursuant to CPLR 3212 (b) a court will grant a motion for summary judgment upon a determination that the movant's papers justify holding, as a matter of law, "that there is no defense to the cause of action or that the cause of action or defense has no merit." Further, all of the evidence must be viewed in the light most favorable to the opponent of the motion (*Marine Midland Bank v Dino & Artie's Automatic Transmission Co.*, 168 AD2d 610 [1990]).

The proponent of a motion for summary judgment must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact as to the claim or claims at issue (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]; *Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]). Failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*Matter of Redemption Church of Christ of Apostolic Faith v Williams*, 84 AD2d 648, 649 [1981]; *Greenberg v Manlon Realty*, 43 AD2d 968, 969 [1974]; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]).

Once the prima facie showing has been made, the party opposing a motion for summary judgment bears the burden of "produc[ing] evidentiary proof in admissible form sufficient to require a trial of material questions of fact" (*Zuckerman*, 49 NY2d at 562; *see also Romano v St. Vincent's Med. Ctr. of Richmond*, 178 AD2d 467, 470 [1991]; *Tessier v New York City Health & Hosps. Corp.*, 177 AD2d 626 [1991]). The substantive law governing a case dictates what facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." (*Anderson v Liberty Lobby, Inc.*, 477 US 242, 248 [1986].)

Here, Langone's motion sought dismissal of the seventh cause of action, which alleged that he violated N-PCL 717 (a), a codification of the fiduciary duty of corporate officers and directors. The elements of the Attorney General's seventh cause of action are (1) the existence of a fiduciary duty; (2) breach of that duty; (3) and a showing that the breach was a substantial factor in causing an identifiable loss. The first element of the cause of action is not controverted. N-PCL 717 (a) expressly provides, and Langone concedes, that as a NYSE director and chair of the Board's Compensation Committee, he had a fiduciary obligation to discharge his duties, "with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."

The dissent correctly recognizes that the scope of Langone's duties present a question of law for the court (*532 Madison Ave. Gourmet Foods v Finlandia Ctr.*, 96 NY2d 280, 288 [2001]). In *532 Madison Ave.*, the Court of Appeals aptly summarized our role in making this determination, which is to: "fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportion-

ate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability. At its foundation, the common law of torts is a means of apportioning risks and allocating the burden of loss. In drawing lines defining actionable duty, courts must therefore always be mindful of the consequential, and precedential, effects of their decisions" (*id.* at 288-289 [internal quotation marks and citations omitted]).

As chair of the Compensation Committee, Langone had discretion to recommend 35% of NYSE executives' variable compensation. With that discretion, Langone had the responsibility, under N-PCL 717 (a), to accurately and completely convey his compensation recommendations to the Board. Langone also had a duty to make compensation recommendations which were in the interest of the NYSE, in good faith and with "conscientious fairness, morality and honesty in purpose" (*see Kavanaugh v Kavanaugh Knitting Co.*, 226 NY 185, 193 [1919]; *see also Pebble Cove Homeowners' Assn. v Shoratlantic Dev. Co.*, 191 AD2d 544, 545 [1993], *lv dismissed* 82 NY2d 802 [1993] ["directors of a corporation have the fiduciary obligation to act on behalf of the corporation in good faith and with reasonable care so as to protect and advance its interests"]).

The issue of whether Langone breached his duties to the Board and to the Exchange is fact based, and it cannot be determined on the record before us: "New York courts have long held fiduciaries to a standard 'stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is . . . the standard of behavior.' *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, *C.J.*). A corporate officer's fiduciary duty includes discharging corporate responsibilities 'in good faith and with conscientious fairness, morality and honesty in purpose' and displaying 'good and prudent management of the corporation.' *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984) (internal quotations omitted)" (*Gully v National Credit Union Admin. Bd.*, 341 F3d 155, 165 [2d Cir 2003]).

In support of summary judgment, Langone submitted excerpts from deposition testimony, minutes from Compensation Committee and Directors meetings, and other documentary evidence. These purported to conclusively establish that Langone effectively communicated Grasso's proposed compensation to the Board in conformity with his duties to his codirectors and the Exchange. Langone asserted that because CAP was a component of Grasso's 1999 employment agreement, a reminder of yearly

CAP awards was not a material element of his presentations to the Board. He alternatively asserted that the Board members were all aware of CAP, that the participants' yearly CAP award was "an automatic contractual consequence" of the Board's other compensation decisions, and that Langone nonetheless made adequate disclosures of recommended CAP awards at the annual February compensation meetings. Langone submitted excerpts from the depositions of a number of Board members who related that they were fully informed as to their compensation decisions under Langone's leadership.

However, in opposition, the Attorney General submitted deposition testimony, minutes from Compensation Committee and Board meetings, and documentary evidence, which demonstrated that while he was chair of the Compensation Committee, Langone may not have effectively communicated Grasso's compensation to the Board. In addition, the record raises questions as to whether Langone's executive compensation recommendations were in the best interest of the NYSE. The Attorney General's submissions included deposition testimony from seven Board members, which indicated that they did not understand the impact of their votes in favor of Grasso's compensation awards.

First, it is uncontested that the Department of Human Resources was directed to remove both the CAP award column and the total compensation column incorporating CAP awards contemporaneous with Langone's succession to the position as chair of the Compensation Committee. It is unclear from the extant record who was responsible for the changes to the format of the compensation worksheets. However, it is also unclear whether Langone adequately explained the newly formatted written materials to the Compensation Committee. Further, some of the Board members testified that they believed Grasso's total compensation for a given year was an amount which, the record reveals, was equal to the value displayed in the total compensation column in the worksheet for that year (a figure which excluded the CAP award referenced in the notations). Whether this was confusion or coincidence is an issue to be explored at trial.

As to damages, the Attorney General asserts that Grasso received exorbitant, unwarranted compensation awards between 2000 and 2002, while Langone was the chair of the Compensation Committee, at the expense of the NYSE. On this issue, the Attorney General's submissions included the testimony of two Board members who opined that they knew that the NYSE members would not be happy if they had been made aware of

the total compensation Grasso was awarded for his work in 2001.

Finally, the relevant inquiry on the present motion is whether, viewing the submissions in the light most favorable to the Attorney General, Langone has established, as a matter of law, that his actions did not constitute a breach of his duties as Compensation Committee chair (*see* N-PCL 717).

Further, the court's role is limited to identifying whether there are material issues of fact, not to determine them (*Sillman*, 3 NY2d at 404). Thus, whether any of the directors who testified that they did not comprehend the implications of their votes either could, or should, have either done additional research or asked questions before approving Grasso's compensation is an issue to be explored at trial. The dissent concludes that the notations describing Grasso's CAP award on the 2000-2002 worksheets adequately apprised the Board that Grasso's actual compensation was the "total compensation" figure in the chart plus 50% of the recommended ICP and LTIP awards. However, deposition testimony in the record indicates that the disclosures and the postulated mathematical calculations may not have been as clear to some of the directors voting to approve Grasso's compensation as they are to the author of the dissenting opinion.

This record exemplifies the general rule that "comparison of a party's conduct with the fiduciary standard of care is a question of fact" (*Cramer v Devon Group, Inc.*, 774 F Supp 176, 185 [SD NY 1991]). For example, the record shows that there were changes in the format of the worksheets under Langone's leadership which may have required explanation to the Compensation Committee; there is inconsistent deposition testimony about Langone's oral presentations to the Compensation Committee and the Board between 2000 and 2002; and there is deposition testimony indicating that Committee members were confused. Thus, Langone has not established as a matter of law that he fulfilled his obligations under N-PCL 717. Accordingly, we affirm the order appealed denying his motion for summary judgment. Concur—Mazzarelli, J.P., Saxe and Sweeny, JJ.

Buckley and McGuire, JJ., dissent in a memorandum by McGuire, J., as follows: Defendant Kenneth G. Langone appeals from the denial of his motion for summary judgment dismissing the complaint as to him. The principal issue on this appeal is a simple one: whether there is a triable issue of fact about whether Langone, who was a member of the Board of Directors (the Board) of the New York Stock Exchange (the Exchange) and the chair of its Compensation Committee at the time of the

Board meetings at issue, failed to inform or remind the Board during three meetings of the Board (in February of 2000, 2001 and 2002) about a contractually-mandated consequence of the decision the Board was to make at each of these meetings on the amount of the bonus it was awarding to its chair and chief executive officer, Richard A. Grasso. In concluding that there is such an issue of fact, the majority relies on: (1) allegedly misleading worksheets prepared by Exchange staff, and (2) purported contradictory deposition testimony of certain directors of the Exchange. However, the worksheets were never presented to the Board, and thus could not possibly have misled the members of the Board, and the deposition testimony the majority relies upon either expressly supports Langone's position or fails to call it into question. Accordingly, there is no triable issue of fact and Langone is entitled to summary judgment for this reason alone. In addition, as discussed below, the majority fails to come to grips with the two other, independent grounds for reversal advanced by Langone.

On March 4, 1999, during a meeting of the Board, the Board met in "executive session"—i.e., outside the presence of Grasso—to discuss the terms of a new employment agreement with Grasso. Earlier that day, the Compensation Committee of the Board, which was then chaired by Bernard Marcus, had reviewed the agreement and voted to recommend it to the full Board. One of the key provisions of that agreement, Grasso's participation in the Capital Accumulation Plan (CAP or the CAP Program), is central to this appeal. And the central concept of CAP, as one of the directors, Gerald Levin, stated when he was deposed in this litigation, is "not at all" difficult. That simple concept is that each year Grasso would be entitled under the agreement to an award of deferred compensation (payable upon retirement or termination) in the amount of 50% of his annual "variable compensation," i.e., the annual bonus awarded to him by the Board. Thus, each year the Board would decide the amount of Grasso's bonus and, by operation of law, the employment agreement would dictate an additional benefit set at one half of the bonus in the form of the deferred CAP award.

As the minutes of the Board meeting state, Director Marcus addressed the Board regarding the proposed employment agreement with Grasso, reviewed its terms and informed the Board that the Compensation Committee had reviewed the agreement and recommended it to the Board. As was testified to by numerous attendees of the Board meeting, both directors and Exchange staff, one of the terms that Director Marcus expressly disclosed to the Board was that Grasso would participate in the

CAP Program and receive a deferred 50% match of his annual bonus. Significantly, there is no testimony or any other evidence that Director Marcus did not make this disclosure concerning a central feature of the proposed agreement. The Board unanimously approved the proposed agreement.

In addition to being uncomplicated, the CAP Program was familiar to the Board. In September 1997, some 18 months earlier, the CAP Program was commenced when the Board approved the program, which was then limited to four "Group Executive Vice Presidents" and provided for a deferred 25% match of their variable compensation. As the minutes of the September 1997 Board meeting make clear, and as is undisputed, the CAP Program was explained to the Board by Frank Ashen, the Exchange's vice-president for human resources, and he informed the Board, inter alia, that the four participants would receive a deferred 25% match of their annual variable compensation. In addition, the then chair of the Compensation Committee, Ralph Larsen, who at the time was also the chair of Johnson & Johnson, told the Board that the Compensation Committee had reviewed the CAP Program and recommended its adoption. By unanimous vote, the Board approved the program.

In June 1999, shortly after Grasso's new employment agreement was approved by the Board, Langone became chair of the Compensation Committee. By then, a three-step process was already in place for determining and approving the annual incentive compensation awards for the prior year for senior Exchange executives, including Grasso. First, Ashen would meet individually with members of the Committee. The materials Ashen brought to these meetings included worksheets he prepared with proposed incentive compensation amounts for senior executives other than Grasso. During the one-on-one meetings, however, Ashen also reviewed the components of Grasso's possible compensation (the annual salary fixed by the agreement at $1.4 million and his incentive or variable compensation), and his potential CAP award. As Ashen testified, "I would say that he [Grasso] would get 50 percent of his variable compensation wherever it ended up." Second, in early February, the Compensation Committee met to discuss and approve the variable (i.e., incentive) compensation of senior executives, including Grasso. In most years, Ashen circulated a worksheet to Committee members with the proposed variable compensation for Grasso after Grasso left the room. Third, after the Committee approved recommendations for incentive compensation awards for Grasso and other senior executives, the full Board would meet later that same day. Assisted by "Speaking Points" prepared by

Ashen, the Committee chair summarized the recommendations and the Board voted on and approved the compensation awards for the senior executives. When Grasso's compensation was under discussion, Grasso would leave the room and the Board would meet in executive session.[1]

At meetings of the Board on February 3, 2000, February 1, 2001 and February 7, 2002 (the February meetings) the Board, in accordance with recommendations of the Compensation Committee, approved variable compensation awards for Grasso of $6.6 million (for 1999), $13.6 million (for 2000) and $16.1 million (for 2001). At the latter two meetings, the Board also approved a "special award" to Grasso of $5 million, a payment that would be excluded from both his variable compensation (and thus from the CAP Program) and his pension plans. Accordingly, pursuant to the 1999 employment agreement, the Board's actions at the February meetings resulted in CAP awards to Grasso of $3.3 million, $6.8 million and $8.05 million.

The crux of the Attorney General's allegations against Langone are set forth as follows in paragraph 208 of the complaint: "Langone breached his fiduciary duty to the NYSE by misleading the NYSE Board of Directors—which had delegated to him the task of explaining the proposed compensation—about the amount of the annual compensation the Compensation Committee was recommending be approved by the Board, through, among other things, *his failure to disclose that Grasso would be receiving as deferred compensation an additional 50 percent of his bonus or ICP [Incentive Compensation Plan] award*" (emphasis added).

In moving for summary judgment dismissing the complaint as to him, Langone relied in part on testimony and documentary evidence relating both to the meetings on March 4, 1999 of the Compensation Committee and the Board approving Grasso's employment agreement and to the September 1997 meeting of the Board at which the CAP Program was established. In addition, and in particular, Langone relied on testimony from directors and other attendees at the February meetings of the Board and the Compensation Committee, and on documentary evi-

---

1. The majority makes repeated references to Langone having "discretion to recommend 35% of NYSE executives' variable compensation." Nothing in the record, however, would support the notion that Langone's authority to make a recommendation was tantamount to the authority to make a determination. In fact, the record evidence is to the contrary. Thus, for example, Ashen testified that the members of the Committee were "[h]igh powered, sophisticated, very savvy executives, not bashful at all." Moreover, "[e]ach meeting [of the Committee] was something of a challenge, because you would get questions sometimes out of left field."

dence relating to these meetings. For present purposes, suffice it to say that numerous directors and others present at the February meetings testified that Langone expressly referred to Grasso's CAP award, and that no director or other person present at the February meetings testified that Langone failed to disclose the CAP award. In short, the evidence relating to the February meetings provided further support for Langone's position that: (1) the Board was fully aware that its decisions on Grasso's variable compensation entailed an additional benefit under the CAP Program of an award of deferred compensation in the amount of 50% of his bonus, and (2) he specifically informed the Board at each of the February meetings of the additional CAP award.

Another meeting of the Board, on April 5, 2001, is relevant. At the meeting both Ashen and Langone made presentations to the Board regarding a proposal, approved earlier that day by the Compensation Committee, to eliminate one of the bonus programs and expand the CAP program beyond the six senior executives who were then participating in it. As the Speaking Points prepared for Langone by Ashen state:

"The Committee recommends expanding the participation in the Capital Accumulation Plan . . .

"There are presently six participants in the Plan. Dick Grasso, Bob Britz and Cathy Kinney participate at the 50% of variable compensation level."

Ashen and Board members Gerald Levin and Robert Murphy testified that Langone, consistent with the Speaking Points, stated that Grasso was one of the executives participating in the CAP plan at the 50% level. Ashen and Board members Murphy and Mel Karmazin also testified that no Board members stated at the April 2001 meeting that he or she had been unaware two months earlier, when Grasso's 2000 variable compensation was approved, that Grasso also was getting a CAP award of 50% of his bonus. On Langone's motion for summary judgment, none of this testimony was controverted.

As discussed below, Supreme Court denied Langone's motion, ruling that material issues of fact existed that precluded granting the motion and that the testimony Langone relied on "drips of credibility [issues]." On this appeal, Langone argues that his motion should have been granted for three reasons: (1) he was under no duty to remind the Board each year of what the Board unquestionably knew when it approved Grasso's 1999 employment agreement, viz., that Grasso would receive an additional benefit under the CAP Program of an award of deferred compensation in the amount of 50% of his bonus, (2) the

undisputed evidence submitted on the motion demonstrated that he did so remind the Board at the February meetings, and (3) the Attorney General failed to raise an issue of fact concerning causation, because the Board did understand that Grasso was entitled to an additional CAP award and thus any alleged failure so to remind the Board could not have been the cause of any injury to the Exchange. I need not reach the first and third of these arguments as Langone's motion should have been granted on the second of these three grounds.

As Langone correctly maintains, the evidence he presented on his motion for summary judgment demonstrates that he did inform the Board of the amount of Grasso's CAP award at each of the February meetings. The Attorney General, however, failed to meet his burden (see *Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]) of producing evidentiary proof in admissible form sufficient to establish the existence of a material issue of fact requiring a trial on the question of whether Langone so informed the Board.

The Attorney General and the majority maintain that the worksheets presented to the Compensation Committee members are sufficient to establish a material issue of fact as to whether Langone so informed the Board at the February meetings. To understand why that is incorrect, the worksheets must be discussed in some detail.

The worksheet prepared by Ashen relating to Grasso for the February 3, 2000 meeting of the Compensation Committee contains columns for his 1999 "Base Salary," "ICP" (Incentive Compensation Plan) and "LTIP" (Long Term Incentive Plan), i.e., the two components of his bonus or variable compensation, "Total Compensation" and "Total Variable Compensation." Immediately below these columns a notation states as follows: "In 1999 Mr. Grasso will receive 50% of his variable compensation in the Capital Accumulation Plan." The worksheets prepared by Ashen relating to Grasso for the other two February meetings of the Compensation Committee contain columns for his 2000 and 2001 "Base Salary," "ICP" and "LTIP," "Variable Comp[ensation]" and "Total Cash Comp[ensation]." On both worksheets, immediately below these columns a notation prominently states (in type identical in size to the preceding text) as follows: "Mr. Grasso will also receive a capital accumulation award equal to 50% of the Variable Compensation."[2]

At most, the first worksheet is ambiguous in that someone

---

2. The majority pays only lip service to this notation in both worksheets, noting only that the worksheets "added the word 'also' to the CAP statement under the chart." With respect to the February 2001 worksheet, the majority

not knowledgeable about Grasso's participation in the CAP Program pursuant to the 1999 employment agreement might understand the notation to mean that the $6.6 million figure in the "Total Variable Compensation" column included a CAP award of $3.3 million. For that to be the case, however, Grasso's award of deferred compensation under the CAP Program would have to have been set at 100% (rather than 50%) of his variable compensation.[3] Moreover, the amount of "Total Variable Compensation" exactly matches the sum of ICP and LTIP (the two components of Grasso's bonus or variable compensation) and the figure set forth as "Total Compensation" equals that amount plus the "Base Salary," thus indicating that CAP must be an additional category.

Putting aside that the notations in the latter two worksheets unequivocally state that the CAP award is an additional 50% of the variable compensation, the first worksheet is irrelevant in any event. In the first place, even if the worksheet could have

---

immediately goes on to make the erroneous assertion that the worksheet "did not reveal: (1) that Grasso's 2000 recommended CAP award was $6.8 million[;] (2) that a $5 million special award was recommended for Grasso for 2000; or (3) that Grasso's total recommended compensation for 2000 was $26.8 million." In fact, it was the Committee that first recommended the special $5 million bonus that was to be excluded from the CAP Program and thus it is hardly surprising that the worksheet prepared by staff before the Committee met did not "reveal" that component of Grasso's "compensation." The majority's reference to a "recommended CAP award" is misleading because neither the Committee nor the Board was asked or required to approve a "recommend[ation]" on the CAP award. But the more important point is that the worksheet certainly did "reveal" that Grasso would receive "Total Cash Compensation" of $15 million plus a CAP award of $6.8 million. For anyone who can divide by two, the worksheets for the Compensation Committee meeting in February 2001 and 2002 provided just that figure. After all, both worksheets expressly stated the full value of Grasso's proposed "Variable Compensation" and clearly noted that "Mr. Grasso will also receive a capital accumulation award equal to 50% of the Variable Compensation." Accordingly, the majority also errs when it states that at the February 2003 meeting of the Compensation Committee the members were given worksheets "which included, for the first time under Langone's leadership, a *figure* for Grasso's proposed CAP award" (emphasis added).

3. The majority ignores this point. Moreover, the majority is simply wrong in stating that this worksheet "*indicat[ed]*" that Grasso's total 1999 compensation was $8 million, notwithstanding that his actual total compensation was $11.3 million" (emphasis added). In fact, it "indicat[ed]" no such thing. Nor is the February 2000 worksheet misleading simply because it does not include the deferred CAP award within the term "compensation." As noted above, the worksheets for the Compensation Committee meetings in February 2001 and 2002 refer to "Total Cash Comp[ensation]" rather than "Total Compensation." As discussed below, any alleged ambiguity in the February 2000 worksheet (to someone not knowledgeable about the CAP Program) is of no moment in any event.

been ambiguous to a director on the Compensation Committee, it does not affirmatively misstate the CAP award, let alone negate or cast doubt on the testimonial and documentary proof both that the Board correctly understood Grasso's participation in the CAP Program and that Langone specifically informed the Board at the February 3, 2000 meeting that Grasso would receive a $3.3 million CAP award in addition to his bonus of $6.6 million. Perhaps most notable in this regard is the testimony of Linda J. Wachner, a member of the Board. Her uncontradicted testimony was that Langone "was careful to articulate each piece, including the CAP award, the 1999 compensation will be $8 million, and that Dick will also receive another $3.3 [million]." In addition, after making his presentation to the Board, Langone asked the members of the Compensation Committee "if there were any things he left out."[4]

The second reason the worksheet is irrelevant is that only Compensation Committee members received the worksheets. The full Board never received either the lone and ostensibly ambiguous worksheet or any of the other worksheets prepared by Ashen. This undisputed fact—the majority ignores it—is critical because, as noted above, the operative allegation of the complaint is that Langone "misle[d] the *NYSE Board of Directors* . . . through . . . his failure to disclose that Grasso would be receiving as deferred compensation an additional 50 percent of his bonus" (emphasis added).

Unfortunately, despite their irrelevance, further discussion of the worksheets is necessary given that they are so critical to the majority's position. The majority takes pains to note that "[a]fter Langone became chair of the Compensation Committee in June 1999, the values of recommended CAP awards were removed from the worksheets distributed to Committee members" and that "the values for 'total variable compensation' and 'total compensation' [columns] no longer included the recommended CAP awards." The majority also maintains that "[i]t is unclear from the extant record who was responsible for the changes to the format of the compensation worksheets."

Why the majority makes these statements and places such

---

4. Another document prepared by Ashen, Speaking Points for Langone's use in presenting the Committee's recommendations on Grasso's compensation to the Board at the February 2000 meeting, should be noted, especially in light of the Attorney General's reliance on a sentence from other Speaking Points prepared by Ashen for the February 2002 meeting. The February 2000 Speaking Points state that Grasso's "total compensation will be $8,000,000" and that he "will also receive a Capital Accumulation Award of 50% of his variable compensation (or $3,300,000) per his contract to be deferred until his retirement."

reliance on the changes in the worksheets is bewildering. Langone had nothing whatsoever to do with these changes in the worksheets. Not a shred of evidence is to the contrary. In fact, Ashen testified that Langone never told him "how to do" or "set . . . up" the worksheets. The only other relevant testimony on this subject is that of Bernstein. As the majority also notes, Bernstein testified that Ashen told her to remove the CAP column from the worksheets. But Bernstein offered only the hearsay explanation that Ashen told her that *Grasso*, not Langone, did not want "CAP Accumulation" and "Total Compensation" columns to be displayed. It may be unclear whether Grasso played a role in the changes to the format of the worksheets, but the record is not unclear with respect to Langone. Nothing but rank speculation and a blatant fallacy— *post hoc, ergo propter hoc*—would support linking to Langone the hearsay-based attribution of these changes to Grasso. Immediately before its claim that the record is unclear with respect to who was responsible for the format changes, the majority stresses that "it is uncontested that the Department of Human Resources was directed to [make the changes] contemporaneous with Langone's succession to the position as Chairman of the Compensation Committee." The majority may not overtly commit this fallacy, but it plainly intends to suggest that the mere fact that the changes occurred after Langone became chair of the Compensation Committee raises an issue of fact regarding who decided to make the changes.

The majority also states that "Bernstein stated that she told Ashen that she thought the worksheets were clearer with the CAP awards displayed." In the first place, however, merely because a statement can be made more clearly, it hardly follows that the statement actually made is not clear, let alone that it is false or misleadingly incomplete. As noted above, the worksheets for the February 2001 and 2002 meetings unambiguously support Langone's position and the worksheet for the February 2000 meeting does not create a material issue of fact. Moreover, the majority fails to mention that Bernstein also testified that she did not "feel uncomfortable" with the changes in the worksheets "because the CAP was footnoted, so I felt that the information was there."

On the subject of the worksheets, finally, the majority also is wrong in asserting that I "conclude[ ] that the notations describing Grasso's CAP award on the 2000-2002 worksheets adequately apprised the Board that Grasso's actual compensation was the 'total compensation' figure in the chart plus 50% of the recommended ICP and LTIP awards." To the contrary, my posi-

tion is that the worksheets do not create a material issue of fact precluding summary judgment for at least two reasons. First, and most importantly, the worksheets submitted to the *Committee members* do not undercut or create a material issue of fact regarding the evidence submitted by Langone that he specifically informed the *full Board* at each of the February meetings of the additional CAP award. Second, and as I have noted without contradiction by the majority, the worksheets for the February 2001 and 2002 meetings of the Committee unambiguously support Langone's position while the worksheet for the February 2000 meeting is at most ambiguous.

In its oral decision denying Langone's motion for summary judgment, Supreme Court relied on the absence of any statement in the minutes of the February meetings of either the Board or the Compensation Committee evidencing a discussion of Grasso's CAP award. Indeed, Supreme Court went so far as to opine that "the Attorney General probably makes a prima facie case by just showing the minutes." In attempting to defend its contention that material issues of fact precluded the granting of Langone's motion, the majority does not rely on the minutes. In stating its view of the facts, however, the majority repeatedly notes that the minutes from each of the three February meetings of the Compensation Committee do not indicate that Grasso's CAP award was discussed. On appeal, moreover, the Attorney General continues to rely on the minutes in this regard.

The absence of any reference in the minutes to a discussion of Grasso's CAP award is as unsurprising as it is irrelevant. As Langone correctly observes, it is hornbook law that board minutes are meant to reflect the board's actions, not all of its discussions (*see* 5A Fletcher, Cyclopedia of Corporations § 2190, at 155-156 [Perm ed] [minutes "should definitely and positively show what *action* was taken by the corporation in the matters that they purport to memorialize," but the "secretary is not obligated to include everything that is said in the minutes as long as the secretary accurately transcribes what has taken place" (emphasis added)]). The majority offers nothing by way of response to this basic point of corporate law and procedure.

The minutes of the February meetings of the Compensation Committee and the Board do reflect the relevant actions taken, i.e., approval of the incentive compensation awards made to

Grasso and other senior executives. By contrast, approval of the CAP award to Grasso or to any other executive was neither an action that the Committee or the Board did take nor an action that either was required to take. Rather, in each year the approval of the incentive compensation award automatically dictated the CAP award (by virtue of the terms of the 1999 employment agreement in Grasso's case and by virtue of the terms of the CAP Program for the other executives). And as Langone notes, when an action was taken with respect to CAP, the minutes so reflect. Thus, when the CAP award was increased for two executives (from a 25% to a 50% match) in February 2000, the Compensation Committee minutes so reflect, and the April 2001 minutes similarly reflect an expansion of the CAP Program to include additional executives.

In short, the absence of any reference in the minutes to a discussion of Grasso's CAP award is devoid of any significance. It neither undercuts nor creates a material issue of fact regarding the documentary proof and uncontradicted testimony of participants at the February meetings of the Board (and of the Compensation Committee) that Langone did remind the Board anew (and the Committee) about Grasso's CAP award.[5]

Nor is the Attorney General persuasive in urging that a material issue of fact on whether Langone misled the Board is raised by a sentence in the Speaking Points prepared by Ashen for

---

5. The Attorney General contends that Langone's "argu[ment] that CAP awards did not have to be approved by the [Board] . . . is undercut by the minutes of the February 2003 meeting of the Compensation Committee," because those minutes state that the Committee had approved "Incentive Compensation of $7,066,666 and a *Capital Accumulation Plan Award of $3,533,333 for Mr. Grasso*" (emphasis added). But it is indisputable (i.e., not an "argu[ment]"), that as a result of the 1999 employment agreement Grasso's CAP awards did not have to be approved by the Board. In fact, a breach of contract would have occurred if the Board had awarded an amount less than that prescribed by the CAP formula set forth in Grasso's employment agreement. Nor does the italicized sentence fragment from the minutes of a Compensation Committee meeting occurring a year *after* the last of the three February meetings of the Board (the meetings the complaint puts in issue) create a material issue of fact about Langone's prior disclosures to the Board at the February meetings. Moreover, this contention about the minutes of the February 2003 meeting of the Committee ignores that the minutes of each of the February meetings (in 2000, 2001 and 2002) reflect other "discussion[s]" regarding Grasso's compensation that were not further described. Finally, as Langone correctly maintains, both sides can speculate about why this fragment appears in the February 2003 minutes of the Compensation Committee. But there is no evidence explaining it (such as testimony from the person who prepared the minutes) and the Attorney General's speculation is not a proper basis for denying Langone's motion for summary judgment (*see Batista v Rivera*, 5 AD3d 308 [2004]; *Warden v Orlandi*, 4 AD3d 239, 242 [2004]; *Leggio v Gearhart*, 294 AD2d 543, 544-545 [2002]).

Langone's use at the February 2002 meeting of the Board in presenting the Compensation Committee's recommendations for Grasso's 2001 compensation. At most, the last sentence of these Speaking Points is ambiguous. The third "bullet-point" notes that in 2000 Grasso received his contractually fixed salary of $1.4 million and "variable compensation of $13.6 million and a Special Payment of $5 million that will vest fully in February 2006." The Speaking Points then continue as follows:

" This year, the Committee recommends that Dick receive, in addition to his salary:

"-$16.1 million in variable compensation

"(up $2.5 million from last year)

"-A Special Payment of $5 million that he will receive when he leaves the Exchange that will also be placed in his SESP account—The Exchange's non-qualified Savings Plan

"-Like the Special Payment we made last year, the $5 million will not be eligible for the Capital Accumulation Plan,[6] nor will it be a part of Dick's retirement calculation

" As a result, all in, the Committee recommends that Dick's compensation be raised $2.5 million, including a deferred special payment of $5 million."

If one understands the term "compensation" in the last sentence to include the CAP award, the Speaking Points would be to this extent misleading in that the $2.5 million increase in the variable compensation dictated a $1.25 million increase in the CAP award so that the increase in total "compensation" would be $3.75 million. On the other hand, if one understands the term "compensation" to exclude the CAP award and include only the compensation the Committee was recommending for approval (the funds which, in contrast to the CAP award, were payable immediately) the Speaking Point would not be misleading.[7] Moreover, anyone who understood the basic elements of Grasso's participation in the CAP plan (which is mentioned in

---

6. The majority states that these Speaking Points do not "indicate a discussion of Grasso's CAP award." Of course the Speaking Points would not indicate any "discussion" by the Board but only the subjects about which Langone was to speak. As is evident, the subject of Grasso's participation in CAP is "indicate[d]" in the Speaking Points.

7. Speaking Points prepared by Ashen two years earlier did so exclude the CAP award from the term "total compensation." Thus, Speaking Points he prepared for Langone's use in February 2000 in presenting the Compensation Committee's recommendations for Grasso's compensation do not include the CAP award as part of the "total 1999 compensation." As noted above, after stating the amount of that "total compensation," the Speaking Points specifically state that "Dick will also receive a Capital Accumulation Award of 50%

the preceding sentence of the Speaking Points) would understand that a $2.5 million increase in "variable compensation" would dictate an increase of $1.25 million in the CAP award.

The extent to which the last sentence of these Speaking Points is ambiguous, however, need not be explored any further. First, there is no evidence that Langone read the Speaking Points as written to the Board. To the contrary, and no evidence contradicts him, Langone testified with respect to these and other Speaking Points prepared for him by others, "I don't read [to the Board]." The Attorney General focuses on one snippet of Langone's testimony and asserts that Langone "conceded that he made the 'all in' statement from the speaking points." In fact, the last sentence was read to Langone during his deposition and he was then asked: "Did you tell the Board that?" Langone's response was: "Words to that effect, I did. I wouldn't have read it." Putting aside that the words "in effect" undermine the fatal concession the Attorney General discovers in that one response by Langone, a subsequent question by the Assistant Attorney General focused specifically on whether Langone had said "all in" during his presentation to the Board. His response was: "Well, first of all, I did not say all in." Of course, a witness's testimony must be viewed as a whole and one snippet of testimony cannot be taken out of its context and used to support or oppose a motion for summary judgment (see *Baillargeon v Kings County Waterproofing Corp.*, 29 AD3d 838, 838-839 [2006]; *Mitchell v Route 21 Assoc.*, 233 AD2d 485, 486 [1996]). Furthermore, as Langone also repeatedly made clear during the questioning on the last sentence of the Speaking Points, the term "compensation" did not include the CAP award.

During this same line of questioning, Langone gave other relevant testimony. With respect to his presentation to the Board, Langone repeatedly stated that the amount of Grasso's CAP award was "give[n]" or "broke[n] . . . out" "very clearly." In this regard, Langone also stressed that there was a "full discussion" of the special $5 million payment that, as is reflected in the penultimate sentence of the very Speaking Points on which the Attorney General relies, was not included in the CAP award. Indeed, at other points in the deposition, Langone testified more generally that he always gave to the Board the dollar amount of Grasso's CAP award at all of the February meetings.

Contrary to what the Attorney General argues in his brief, Langone's testimony about his presentation to the Board at the

---

of his variable compensation (or $3,300,000) per his contract to be deferred until his retirement."

February 2002 meeting was not contradicted by the testimony of Gerald Levin, another director. When Levin was asked at his deposition (more than three years after the meeting) whether Langone had said during the meeting how much the CAP award was, Levin answered: "Either [Langone] did identify the number, or it wasn't necessary because he was identifying the variable compensation against which the 50 percent CAP was taken. And the fact that the $5 million [special award] was excluded for CAP purposes made it very clear that it [i.e., the CAP award] was $8,050,000."

By not excluding the possibility that Langone had not belabored the obvious, Levin did not with this answer, as the Attorney General argues, "thereby confirm[ ] the existence of at least a factual question about whether Langone made the necessary disclosures to his fellow directors." To the contrary, it confirms that at least for Levin all that was necessary was for Langone to state the amount of the variable compensation. Even assuming without any evidentiary support that this simple concept (divide variable compensation by two to determine the CAP award) was not obvious to all of the other directors, Levin's answer certainly does not preclude summary judgment.[8] Like the last sentence of the February 2002 Speaking Points, it merely "g[i]ve[s] rise to nothing more than a shadowy semblance of an issue" insufficient to defeat summary judgment (*Hooke v Speedy Auto Ctr.*, 4 AD3d 110, 112 [2004] [internal quotation marks omitted]).

The majority relies in crucial part on numerous assertions it makes about the excerpts from the deposition testimony of members of the Board that were submitted by the Attorney General in opposition to the motion. These assertions are erroneous at best. The broadest of them are the following:

"The Attorney General also submitted excerpts from the deposition testimony of a number of the Board members, including Deryck Maughan, Charles J. Bocklet, David Komansky, James Duryea, William Harrison, Robert Murphy, and H. Carl McCall. These witnesses' testimony, much of which is set forth in the factual recitation, indicated misconceptions as to the magnitude

---

**8.** Of course, the notion that the sophisticated business leaders and other prominent persons who comprised the Board did not grasp this elementary concept is risible. The majority nonetheless maintains that "deposition testimony in the record indicates that the disclosures and the postulated mathematical calculations may not have been as clear to some of the directors voting to approve Grasso's compensation as they are to the author of the dissenting opinion." Suffice it to say that the majority does not and cannot quote or paraphrase the testimony of anyone to support this claim about what is "indicate[d]" by this unspecified deposition testimony.

of the compensation that they had voted to approve for Grasso in February 2000—February 2002."

"The Attorney General's submissions included deposition testimony from seven Board members, which indicated that they did not understand the impact of their votes in favor of Grasso's compensation awards."

These assertions are notable in at least four aspects. First, the majority does not quote or paraphrase even a *single* example of this supposed testimony. Rather, the majority asserts only that "much" of it is "set forth" elsewhere in its writing. As discussed below, however, the majority can eke no support for its position from the excerpts of the deposition testimony that are referred to elsewhere in its writing. Second, the majority again makes claims only about what is "indicated," not what was testified to, by these Board members. Third, the majority makes no claim that when they voted to approve Grasso's bonus any of these seven Board members had misconceptions about or failed to understand the magnitude or effect of their votes on Grasso's CAP award. Rather, the majority speaks in far more general terms about alleged misconceptions and failures to understand relating to Grasso's "compensation." Fourth, the majority implicitly and illogically assumes that any such misconception or failure to understand by a Board member reflects a disclosure failure by Langone.

The truth is that none of the excerpts contain testimony from any of these directors that at the time of the votes in favor of Grasso's bonus awards, he or she was not aware of or did not understand that Grasso also would receive a CAP award of 50% of the amount of the bonus. The only testimony from any of the excerpts (the Attorney General submitted excerpts from the deposition testimony of 16 members of the Board) that remotely bears on these assertions by the majority was given by David Komansky and Linda Wachner. Mr. Komansky testified that without seeing the relevant documents, he could not remember (not that he did not understand at the time) what the impact of the compensation awards in 2000 and 2001 was on a pension benefit Grasso received, the "Supplemental Executive Retirement Plan" or "SERP" (*not* the CAP award). Ms. Wachner testified only that she did not know how much money was being saved in terms of SERP benefits when the determination was made in February 2001 that the special $5 million bonus would not count for purposes of Grasso's SERP benefits.[9]

The majority's other assertions about supposed deposition

---

**9.** Presumably, the majority does not rely on testimony given by Komansky during a prelitigation investigation conducted by the Attorney General at

testimony or other ostensible evidence supporting its position also are baseless. The majority writes: "[I]t is also unclear whether Langone adequately explained the newly formatted written materials to the Compensation Committee. Further, some of the Board members testified that they believed Grasso's total compensation for a given year was an amount which, the record reveals, was equal to the value displayed in the total compensation column in the worksheet for that year (a figure which excluded the CAP award referenced in the notations)."

The first sentence is unsupported and irrelevant. The worksheets were given to Compensation Committee members by Ashen when he met on a one-on-one basis with the members. Whether Ashen or Langone explained the changes in the format of the worksheets either before or at the February 2000 meeting of the Committee is of no moment at all. The complaint alleges a failure by Langone to make adequate disclosure to the Board, not the Committee, of Grasso's CAP award. Even assuming some unknown member or members of the Committee were confused by the format change in the worksheet prepared by Ashen for the February 2000 meeting of the Committee, any such confusion would be irrelevant to Langone's alleged liability. The relevant and decisive point is that no testimony or documentary evidence creates a material issue of fact that undercuts Langone's evidentiary showing that: (1) the Board understood that Grasso would receive an additional benefit under the CAP Program in the form of deferred compensation in the amount of 50% of his bonus, and (2) he specifically informed the Board at each of the Board meetings of the additional CAP awards.

As for the second sentence, the majority fails to identify the witnesses who purportedly gave such testimony. Presumably, however, the majority is referring to certain testimony (from either Deryck Maughan, Charles Bocklet, Robert Murphy, William Harrison or James Duryea, or all of these Board members) to which it refers, directly or indirectly, elsewhere in its writing.

which Langone was neither present nor represented by counsel. Although the Attorney General also submitted an excerpt from this testimony in opposition to Langone's motion, it is not admissible evidence against Langone (see *Bigelow v Acands, Inc.*, 196 AD2d 436, 439 [1993]). In any event, to the extent that excerpt suggests that at the time he was deposed during the investigation Komansky erroneously understood from a document shown to him that the $8 million in "compensation" stated to have been received by Grasso in 1999 included the CAP award, that misunderstanding was refuted in the admissible deposition testimony given by Komansky in this litigation that Langone submitted in reply. Again, moreover, any isolated misunderstanding that a director may have had cannot be equated with a disclosure failure by Langone.

As discussed below, none of that testimony comes close to raising a material issue of fact that precludes summary judgment.

Before discussing that testimony, other particularly inscrutable references by the majority to the deposition testimony should be noted. At the end of its writing, as if by way of summary, the majority relies on both "inconsistent deposition testimony about Langone's oral presentations to the Compensation Committee and the Board between 2000 and 2002" and "deposition testimony indicating that Committee members were confused." Once again, the majority does not provide any details that would explain what testimony it is relying on or who gave the testimony. Nor does the majority provide any reason to conclude that the "inconsistent deposition testimony" relates to a material issue of fact concerning Langone's statements to the full Board about Grasso's CAP award. The majority is just as uninformative about the "testimony indicating that Committee members were confused." What were they confused about, when in point of time they were confused and why their confusion is relevant all are matters about which the majority is completely silent.

That silence reflects the simple reality that no member of the Board testified that when voting on Grasso's bonus he or she was "confused" or did not understand Grasso's CAP award. The repeated failures by the majority to provide any relevant particulars are telling. None are provided because they do not exist.

Putting aside the majority's unsupported generalizations about the deposition testimony, no material issue of fact is raised by any of the deposition excerpts the majority paraphrases or quotes. True, Deryck Maughan testified that the February 2000 worksheet prepared by Ashen "would have been clearer for everybody if there had been a column called 'CAP' and then a real total displayed." As already noted, however, any purported ambiguity in the worksheet prepared by Ashen and presented only to Compensation Committee members (who presumably would be even more knowledgeable about the CAP program than other Board members) cannot sensibly be equated with a disclosure failure by Langone, let alone such a failure in the presentation Langone made to the full Board. Moreover, Maughan left the Board in June 2000 and understandably did not have a "good memory of a CAP conversation" in the February 2000 meeting.[10] Nonetheless, despite his "poor memory of the CAP conversation," he knew that it "took [Grasso's

---

**10.** The record on appeal is unclear as to whether Maughan is referring to the February meeting of the Compensation Committee or the Board.

compensation] to some higher number." The perhaps more decisive point about Maughan's deposition is that he never testified that Langone failed to mention Grasso's CAP award in his presentation to the Board in February 2000.

In an apparent reference to Maughan and Charles Bocklet, another director, the majority states that "[t]wo other members of the Compensation Committee gave deposition testimony that they thought Grasso had been awarded approximately $8 million in total compensation for 1999." Similarly, after stating that Bocklet "testified at his deposition that he believed that Grasso's total 2000 compensation was $15 million," the majority immediately goes on to write that "[t]his was the value in the 'total compensation' column of the worksheet, not the $26.8 million Grasso was actually awarded."[11] In substance, during their depositions these directors were asked by the Assistant Attorney General to guess, years after the relevant meetings of the Board, what Grasso's total "compensation" was in the years in question. Their incorrect "belief" or recollection is not admissible proof of anything (other than the understandable fallibility of their memories). As a matter of logic, moreover, from their incorrect "belief" about Grasso's total "compensation"—even putting aside the potential ambiguity (discussed above) in that term—it does not follow that any one component of that "compensation" was not disclosed to them. For these reasons, the raw recollections or beliefs of these two directors "g[i]ve[s] rise to nothing more than a shadowy semblance of an issue" (*Hooke v Speedy Auto Ctr.*, 4 AD3d at 112). Furthermore, like all the other directors and staff who were present at the February meetings, neither Maughan nor Bocklet testified that Langone did not disclose Grasso's CAP award.

The majority also writes that "Compensation Committee member R. Murphy, and Board members W. Harrison and J. Duryea all testified at their depositions that they believed they had voted to approve 2001 compensation for Grasso in the $20 million range." For the reasons just stated, what these directors "believed" years later does not raise a material issue of fact about whether Langone disclosed Grasso's CAP award. Furthermore, even if these directors had such an erroneous belief at the time they voted to approve the compensation—none of them so

---

**11.** To be clear, Bocklet never testified that his belief (more accurately, his guess) that Grasso's total compensation was $15 million was derived from or connected to the "total compensation column of the worksheet." Bocklet gave no such testimony. Rather, years after the February 2001 meeting, he simply testified, without reference to the worksheet or any column in it, that he believed Grasso's total compensation for 2000 "[w]as 15 million."

testified—that error cannot rationally be equated with a failure of Langone to make adequate disclosure (not, unless, Langone's duty to make adequate disclosure made him a guarantor that all Board members would understand him correctly).[12]

Another reason the majority's reliance on these snippets of deposition testimony is misplaced is that the belief of these directors was correct. The amount of compensation that the Board "voted to approve" ($21.1 million) *was* in the $20 million range. The other components of Grasso's "compensation" (his salary of $1.4 million and his CAP award of $8.05 million) were not voted on but were, respectively, specified in or dictated by his employment agreement.[13]

That the majority relies on such an irrelevant snippet from Murphy's testimony is particularly unfortunate given other testimony from Murphy that is highly relevant both to an understanding of that snippet and the core allegation of the complaint that Langone failed to make adequate disclosures to the Board about Grasso's CAP award. With specific reference to his testimony that he believed he had voted in 2002 for compensation for Grasso in 2001 in the "low 20s," Murphy testified he had been focusing on the discretionary components of Grasso's compensation that the Compensation Committee actually was approving, that he knew Grasso had other elements of his compensation that were not discretionary and that the CAP award was one of the components that the Committee and the Board did not have to vote on. He also testified that at the February 2002 meeting of the Compensation Committee he understood that by approving an incentive payment to Grasso of $16.1 million, "there would also be a payment into Mr. Grasso's CAP." Indeed, he testified that he understood all the elements of Grasso's compensation for each of the years he was on the Board and voted to approve it.

The majority ignores other highly relevant testimony from

12. Nor for that matter, could the "confusion" the majority relies upon be equated with such a disclosure failure by Langone.

13. Moreover, Harrison testified that he was not in a position to deny that Langone made the CAP disclosures contained in the Speaking Points. Because the majority emphasizes what certain directors "believed," it bears note that Duryea answered "I do not" to a question asking him if he "ha[d] any reason to believe that Mr. Langone misled you in any way concerning Mr. Grasso's compensation." Finally, the majority also relies on opinion testimony from Bocklet and Murphy to the effect, as the majority puts it, that the members of the Exchange "would not be happy" if they knew the Compensation Committee was approving $30 million in compensation for Grasso in 2001. This opinion testimony adds some color to the majority's position but is manifestly irrelevant to the issue of what Langone said to the Board about Grasso's CAP award.

Murphy. Back in 1999, when Grasso's employment agreement was approved, Murphy understood that the 50% match of the CAP benefit to Grasso was in addition to his bonus. Asked if the 50% match was a difficult concept to understand and to apply, Murphy answered, "[n]o." Murphy never heard or saw anything that suggested to him that there was any confusion among Board members about what the 50% match meant. Asked if Langone ever said anything about CAP at any meeting of the Board or the Compensation Committee that he viewed as misleading, Murphy answered "[n]o." In short, far from creating a material issue of fact supporting denial of Langone's motion for summary judgment, Murphy's testimony supported that motion in every relevant respect.[14]

That leaves only the majority's reliance on the excerpt from the deposition testimony of H. Carl McCall that the Attorney General submitted in opposition to the motion. That excerpt consists of three pages of deposition testimony in which McCall testified only that "as a member of the board, we did not receive full information, detailed information about the various components of the compensation" and that it was his "understanding that we did not always receive details about the components, including deferred income as one of the components." But even putting aside the ambiguous scope of the term "compensation," it hardly follows from the asserted fact that full or detailed information was not received, or that members of the Board did not receive even the basic information about Grasso's CAP award. McCall gave testimony on that very subject which was not included within the excerpt submitted by the Attorney General. Specifically, McCall testified that there "were discussions about a CAP program" but that he could not remember the details. Moreover, in the above-quoted testimony, McCall was referring to a memorandum captioned, "H. Carl McCall, Summary Of Events Regarding NYSE Executive Compensation." In another portion of the memorandum, one that the majority and the Attorney General do not mention, McCall states that "[a]lthough the board knew about and voted on annual salaries *and awards*, it was not informed about accumulated benefits and how particular salary actions would lead to *pension* on [sic] long-term accumulations" (emphasis added). In short, nothing in McCall's testimony undercuts Langone's evidence that he disclosed the CAP award. If

14. Langone asserts in his brief, and the Attorney General does not contend otherwise, that the Assistant Attorney General deposing Maughan and Bocklet never even asked either witness whether Langone had disclosed Grasso's CAP award.

anything, the testimony and memorandum actually support Langone's position.

In the course of denying Langone's motion for summary judgment, Supreme Court stated that the issue of the sufficiency of the disclosure was a case of "he said, she said." To the contrary, however, just the opposite is true. As noted above, and as the majority does not dispute, numerous directors and others present at the February meetings of the Board testified that Langone expressly referred to Grasso's CAP award; no director or other person present at the meetings testified that Langone failed to disclose the CAP award. Nor does any documentary evidence raise a triable issue of fact with respect to whether Langone disclosed Grasso's CAP award. Thus, as Langone correctly observes, this is a case of "everyone said, no one said."

One last aspect of the majority's writing warrants a response. Although the complaint alleges that Langone failed to make adequate disclosures regarding Grasso's CAP award, the majority mints an entirely new theory of liability. Thus, the majority writes, "[i]n addition, the record raises questions as to whether Langone's executive compensation recommendations were in the best interest of the NYSE." This unsupported assertion—the majority refers to nothing in the record—is as irrelevant as it is conclusory and inscrutable. The Attorney General has never asserted that Langone is liable on this ground, not in his complaint, not in opposing Langone's motion and not in the brief he submitted to this Court.

One other contention by the Attorney General must be addressed. In opposing Langone's motion for summary judgment, the Attorney General charged that Langone also had breached his fiduciary duty to the Exchange by: (1) misleading the Compensation Committee regarding the forfeitable character of Grasso's CAP awards, and (2) failing to disclose Grasso's accumulated pension benefit, the "Supplemental Executive Retirement Plan" or "SERP." On this appeal, Langone asserts in his main brief that these two allegations stating new theories of liability were raised by the Attorney General for the first time in the brief he submitted to Supreme Court in opposition to Langone's motion for summary judgment.

The Attorney General, however, argues that Langone had "adequate notice" of these two theories of liability by virtue of, in part, paragraph 208 of the complaint. Although I have quoted it in full already, paragraph 208 bears repeating here given the specific argument the Attorney General makes. It provides: "Langone breached his fiduciary duty to the NYSE by misleading the NYSE Board of Directors—which had delegated to him

the task of explaining the proposed compensation—about the amount of the annual compensation the Compensation Committee was recommending be approved by the Board, through, among other things, his failure to disclose that Grasso would be receiving as deferred compensation an additional 50 percent of his bonus or ICP award." According to the Attorney General, in light of the phrase "among other things" and "numerous other allegations regarding SERP in the complaint, . . . Langone was on notice that his failure to disclose SERP was included as a fundamental aspect of his breach of duty." With respect to the theory of liability premised on the charge that Langone misled the Compensation Committee regarding the forfeitable character of the CAP awards, the Attorney General does not similarly point to any other allegations in the complaint regarding their forfeitable character. Rather, the Attorney General relies only on the words "among other things" in paragraph 208 and interrogatory responses which assertedly "disclose" the charge that Langone had "[c]onceal[ed] the unvested status" of the CAP awards.[15]

For numerous reasons, the two theories of liability charging that Langone had misled the Committee regarding the forfeitable nature of the CAP awards and failed to disclose accumulated SERP benefits are untimely and thus cannot support denial of Langone's motion for summary judgment. First, I agree with the reasoning of the panel of the United States Court of Appeals for the Federal Circuit in *Korody-Colyer Corp. v General Motors Corp.* (828 F2d 1572 [1987]) in rejecting the plaintiff's relation-back argument premised in part on the words "among other things" in the complaint. As the panel stated, these words constitute a "catchall and meaningless phrase" (*id.* at 1575) and accepting the plaintiff's relation-back argument on the basis of that phrase "would undermine the notice pleading approach of the Federal Rules of Civil Procedure" (*id.* at 1575-1576), and similarly the pleading requirements of the CPLR (*see* CPLR 3013, 3014). In short, the phrase gives fair notice of nothing.

---

**15.** In the course of announcing its ruling on the motion for summary judgment, Supreme Court made no mention of either of these two theories of liability; it neither ruled on whether the Attorney General properly had raised them in opposition to the motion nor on whether there was a material issue of fact that precluded granting summary judgment to Langone on either or both of these two theories. At a later proceeding that same day, however, Supreme Court ruled that the Attorney General would be permitted to pursue at trial the allegation relating to the SERP benefits. In doing so, Supreme Court stated that it regarded the Attorney General's interrogatory responses as "the equivalent of an amplification of a pleading."

Second, the phrase is particularly unhelpful to the Attorney General because it refers to the allegation that Langone misled the Board "about the amount of the annual compensation the Compensation Committee was recommending be approved by the Board." Thus, at most this phrase purports to indicate that Langone misled the Board about Grasso's "annual compensation" through means other than the one specifically alleged. The new allegations relate to different subjects, the *forfeitability* of the deferred CAP awards and the accumulated *retirement* benefit.

Third, the "other allegations regarding SERP in the complaint" did not give Langone fair notice that he was being charged with breaching his fiduciary duty by failing to disclose Grasso's accumulated SERP benefit. Some of those "other allegations regarding SERP" merely state the fact that SERP was one of the benefits Grasso received (paragraph 37), explain background facts relating to SERP-type benefits generally, Grasso's contractual entitlement to "SERP-like benefits," and the total of the SERP benefit for Grasso as of 2002 (paragraphs 46-48), or relate to and are contained within one of the causes of action against Grasso (paragraphs 167-172). Another alleges the nondisclosure—it does not say anything identifying the person or persons responsible for the nondisclosure—of certain SERP benefits pursuant to Grasso's 1995 and 1999 employment agreements, both of which were entered into before Langone became chair of the Compensation Committee (paragraphs 70, 78-82). This allegation, moreover, appears to relate to one or more of the six causes of action against Grasso, as it asserts as well that this allegedly undisclosed benefit "unlawfully enriched Grasso by providing him with an interest-free loan at a corresponding cost to the NYSE" (paragraphs 70).

Similarly, another of the allegations merely alleges that "information was withheld from the Board" about the effect the compensation awards would have in increasing Grasso's SERP benefit and the amount of the accumulated benefit (paragraph 20 [ii], [iii]). Again, nothing is alleged about the identity of the person or persons responsible for withholding this information.[16] To the extent the complaint alleges any entity or person to be responsible for not disclosing SERP benefits, paragraph 85 refers to an analysis prepared in February 2001 of "the

---

16. From the immediately preceding paragraph, it would appear that the complaint alleges that Langone was one of the persons from whom the information was withheld. Thus, the complaint asserts that Ashen and one of the Exchange's consultants "have confirmed that the Compensation Committee and Board were misled."

multiplier effect" that a bonus award could have on Grasso's SERP benefit and to an accompanying "spreadsheet detailing the amount of Grasso's accumulated SERP." It then goes on to allege only that "[t]*he NYSE did not transmit* the . . . analysis, the information it contained, or the spreadsheet *to the members of the Compensation Committee or Board of Directors*" (emphasis added). Obviously, Langone is not the "NYSE" but was a member of both of the entities to which the information was not transmitted. At no point does the complaint allege that Langone ever received either the analysis, the information it contained, or the spreadsheet.[17] The apparent point of these allegations, moreover, is stated in paragraphs 88 and 89. That is, they support certain of the causes of action against Grasso asserting that the SERP benefit awards are invalid under N-PCL 715 (f) and are "void and subject to rescission" (paragraph 89).

Fourth, the Attorney General's reliance on the interrogatory responses to save the two unpleaded theories of liability is meritless. Langone moved for summary judgment by notice of motion dated January 23, 2006. The interrogatory responses are dated May 12, 2006, nearly five months later, a little over a month before the Attorney General's opposing papers were submitted. By the time Langone received the interrogatory responses, the massive discovery efforts of the parties were virtually if not actually completed.[18]

For these reasons, the two unpleaded theories of liability are untimely and cannot support the denial of Langone's motion (*see Abalola v Flower Hosp.*, 44 AD3d 522, 522 [1st Dept 2007] ["Plaintiff's physician expert also improperly raised, for the first time in opposition to the summary judgment motion, a new theory of liability . . . that had not been set forth in the complaint or bills of particulars"]; *Mathew v Mishra*, 41 AD3d 1230, 1231 [4th Dept 2007] ["a plaintiff cannot defeat an otherwise proper motion for summary judgment by asserting a new theory of liability . . . for the first time in opposition to the motion" (internal quotation marks and brackets omitted)]; *Pinn v Baker's Variety*, 32 AD3d 463, 464 [2d Dept 2006] ["(r)aised for the first time in opposition to the motion for summary judg-

---

**17.** Paragraph 86 makes reference to another report prepared by a different consultant to the Exchange. The complaint alleges neither that Langone withheld it from anyone nor that he ever received it.

**18.** At oral argument on Langone's motion, his attorney stated that when the motion was made in January, 36 witnesses had been deposed; that the Attorney General wanted more time to respond; and that ultimately 61 witnesses were deposed—resulting in 29,000 pages of deposition testimony—and more than a million pages of documents were produced.

ment, this theory (of liability) should not have been considered as a basis for defeating summary judgment"]).[19]

Finally, as noted earlier, given my conclusion that Langone is entitled to summary judgment on the ground that the Attorney General failed to raise a material issue of fact on the question of whether he made disclosure of Grasso's CAP award at the February meetings, I need not reach Langone's arguments that he also is entitled to summary judgment on the grounds that he had no duty to remind the Board about the CAP benefit and the Attorney General failed to raise an issue of fact concerning causation. Because it affirms the denial of Langone's motion, however, the majority must come to terms with Langone's additional arguments.

With respect to the issue of the scope of the duty owed by Langone, none of the cases cited by the majority in its brief discussion of the issue hold that the high standard fiduciaries must observe (which, of course, applies as well to the other Board members) required Langone to remind the members of the Board of what they either actually knew about Grasso's CAP benefit (as the submissions on the motion demonstrate) or should have known. After all, each of the other Board members had an independent duty in approving Grasso's compensation awards to act on a reasonably informed basis after making a reasonable inquiry into material matters (*see Hanson Trust PLC v ML SCM Acquisition, Inc.*, 781 F2d 264, 274-275 [2d Cir 1986]). The majority similarly fails to meet Langone's causality argument. Suffice it to say that it is far from obvious that, even assuming a majority of the Board did not know of Grasso's participation in the CAP program, the Exchange was injured by a breach of a duty that Langone owed rather than a breach by the directors who did not know.

**19.** Presumably, the majority agrees with this conclusion. After all, the majority has nothing to say about it and does not even mention the Attorney General's effort to oppose Langone's motion on the basis of unpleaded theories of liability.